**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

| | |
|---|---|
| LAUREN BLYTHE,<br>Plaintiff,<br><br>-against-<br><br>EDUCATION PLUS CORPORATION d/b/a THE FAMILY FOUNDATION SCHOOL; BETTY ARGIROS; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a "CINDY RAY"; JEFFREY BRAIN a/k/a JEFF BRAIN; NBT BANK, N.A.; NBT BANCORP INC.; SYSCO CORPORATION; SYSCO SYRACUSE, LLC; THE HANCOCK HERALD; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; FRENCH WOODS PERFORMING ARTS INC. d/b/a FRENCH WOODS SPORTS AND ARTS CENTER; K9-5 INC.; EAGLE VALLEY SEARCH, RESCUE AND RECOVERY TEAM, INC. d/b/a EAGLE VALLEY SEARCH DOGS; HIGHLIGHTS FOR CHILDREN, INC.; BOYDS MILLS (FORMERLY THE HIGHLIGHTS FOUNDATION); NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; VILLAGE OF HANCOCK, NEW YORK, individually and through the VILLAGE OF HANCOCK POLICE DEPARTMENT; TOWN OF HANCOCK, NEW YORK; DELAWARE COUNTY SHERIFF'S OFFICE; COUNTY OF DELAWARE, NEW YORK; and DELAWARE COUNTY BOARD OF SUPERVISORS,<br>Defendants. | Case No.:<br>3:26 -cv- 2229 (AJB/ML)<br><br>**VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---------------------------------------------------------------------X

Plaintiff Lauren Blythe, by her attorneys, Johannesen & Umana, P.C., for her Verified Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1. From no later than August 1990 through the school's 2014 closure, Defendants operated the Family Foundation School ("FFS") in Hancock, New York, disguised to the public and to parents as a therapeutic boarding school for troubled adolescents. In reality, FFS confined the minor children placed in its custody, including Plaintiff Lauren Blythe, a fifteen-year-old from Wilmington, North Carolina, delivered to FFS by her mother on February 12, 2001, two days after

a single one-hour evaluation by an educational consultant in Richmond, Virginia, and held there for twenty-nine months, until June 28, 2003, under conditions of forced, uncompensated labor and a degrading sanction regime, while FFS extracted tuition of approximately $3,200 per month from her mother on the representation that her daughter would be in a safe place, counseled by a staff of psychologists, licensed therapists, and teachers. No such staff existed. Immediately upon her arrival, Plaintiff was strip searched by the staff member assigned to her as her "sponsor," and in the course of that search an item that had been surgically placed within her body during a prior gynecological procedure was dislodged, an injury she discovered only afterward, in the shower. In place of treatment, FFS made her sit with raw meat on her lap because, staff told her, she "treated her body like a piece of meat"; faulted her for her appearance and then, when she complied, stripped her of makeup and put her in plain, baggy clothing under a "poverty sanction" so that she would not be "attractive"; cut her off from her mother for months and thereafter rationed her to monitored nine-minute telephone calls and censored letters; made her read aloud to her mother, at her first visit, before three adult staff, a written confession of every sexual encounter and every wrong she could recall; told her, when she reported that her mouth and throat were itching from a meal, to stop lying and finish her plate, and let her go into anaphylactic shock; and put her to the institution's labor, cleaning its flea-infested pig pens, shoveling its snow, keeping its gardens and grounds, carrying cinder blocks back and forth as punishment, sitting hours-long watches over children it held in an isolation room, and performing landscaping and construction work at a religious retreat house in Pennsylvania to which it transported her. Twice she fled; twice she was returned, once after surrendering herself at a police station in Binghamton, New York, and no one asked why a child had run. She left on June 28, 2003, a month past her eighteenth birthday, with a

diploma from an institution that had taught her nothing she could use, and she has not been able to complete a college education since.

2. FFS's unlicensed and abusive operation was already a matter of public record when Plaintiff arrived: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license New York law required. Defendants continued to operate, enroll, and confine children, including Plaintiff, delivered to FFS more than a decade later, in open disregard of that order, while representing to Plaintiff's mother that FFS was a qualified therapeutic institution staffed to treat her.

3. Plaintiff was placed at FFS through the referral network on which the enterprise depended. Following an incident in which Plaintiff, then fifteen, was apprehended for shoplifting, her mother took her to a single one-hour appointment with an educational consultant in Richmond, Virginia, who, on the strength of that one session, told Plaintiff's mother that her daughter needed more structure and counseling than could be provided at home, arranged her enrollment at FFS by telephone, and represented that FFS would provide a safe place and counseling by a staff of psychologists, licensed therapists, and teachers, together with staff in recovery from their own addictions. On information and belief, the same consultant referred other children, including at least one of Plaintiff's own friends, to FFS during the same period. Within two days Plaintiff was enrolled, and her mother flew with her from Raleigh, North Carolina to Binghamton, New York and delivered her to FFS on February 12, 2001, without either parent having toured the campus, relying on the consultant's representations and on FFS's own marketing. Her mother paid FFS approximately $3,200 per month for the twenty-nine months that followed, approximately $92,800 in tuition, together with approximately $7,200 in airfare, car rental, lodging, meals, and fuel for the trips to Hancock that the institution's visiting rules, Plaintiff's flights from the campus, and her

graduation required. Defendants accepted Plaintiff into an institution that employed no qualified treatment professionals, subjected her on arrival to a strip search that injured her, and extracted from her, as from other students, sustained uncompensated institutional labor imposed as punishment.

4. Because Plaintiff tried to comply with every demand made of her, FFS exploited that compliance: it designated her a dormitory leader as a disciplinary measure, a role that increased the labor demanded of her, and it answered her compliance with contradictory sanctions that no conduct could satisfy. The compliance FFS produced was the product of fear, isolation, and humiliation, not treatment, and it masked, rather than addressed, the problems for which Plaintiff had been sent there. She left FFS on June 28, 2003, at eighteen, with no treatment for the difficulties for which she had been enrolled, and the "structured and safe" environment her mother had paid for produced no lasting result. She has attempted college repeatedly and has never been able to sustain it, having never been taught how to study or to stay focused, and she has built a living for herself as an artist without the education her mother paid for. In 2024, a licensed clinician diagnosed her with post-traumatic stress disorder and identified her experiences at FFS as its primary cause.

5. Following FFS's 2014 closure, its principals, Defendants Emmanuel Argiros and Cindy Argiros, moved the enterprise's remaining assets, including the FFS real property itself, into family-controlled entities and the hands of a longtime friend and neighbor of the Argiros family at below-market value rather than preserve them to answer for the decades of conduct described herein, and thereafter remained silent even after that conduct was judicially confirmed at the 2025 federal criminal trial of FFS staff member Paul Geer. The dormitories, the chapel, the kitchen, the gardens and grounds Plaintiff kept, the paths she cleared of snow, and the pens in which she and the other

children raised the institution's livestock, kept, cleaned, and maintained without pay, are the same structures and the same land on which the purchaser's affiliate, the French Woods performing arts camp, has housed, fed, and charged paying campers every summer since; on information and belief, that camp charges up to approximately $16,000 per camper for a summer on the campus the children of FFS built and kept. The enterprise's last transaction was not a sale; it was the conversion of the children's labor into a revenue-producing property that still produces revenue today, for an entity that had been the Argiros family's neighbor and friend for many years, and that has never been asked to account for it.

6. The evidence and testimony adduced in the 2025 federal criminal prosecution of Paul Geer, an FFS staff member throughout Plaintiff's enrollment, convicted on March 3, 2025 after a two-week jury trial and sentenced on September 4, 2025 to 327 months in federal prison for sexually abusing and trafficking FFS students across state and international lines, revealed for the first time the coordinated, institutional, and enterprise character of the conduct at FFS across decades of its operation, including the deliberate destruction of student and abuse-complaint records by the Argiros family, the institution's practice of billing families for the overnight isolation of their children, and the admission of the institution's own president that it employed no clinical professionals, facts Defendants had concealed for decades. That disclosure, and the events described herein, gave rise to the filing of this action.

7. Plaintiff brings this action seeking compensatory damages, trebled where applicable under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. § 1962 (RICO), 18 U.S.C. §§ 1589, 1590, 1591, and 1595

(Trafficking Victims Protection Reauthorization Act), 18 U.S.C. § 2255, and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, forced to labor, and subjected to the sanction regime described herein, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) the tuition payments giving rise to Plaintiff's RICO injury were transmitted to and processed within this District; (c) Plaintiff was transported from this District to Pennsylvania and back on the trips described herein, and fled from the institution's custody within this District and was located and returned to it within this District on the occasions described herein; and (d) the federal criminal prosecution of Paul Geer described herein was conducted in this District.

11. This Court has personal jurisdiction over each Defendant because each Defendant resides in, is organized under the laws of, maintains offices or operations in, or transacted business in the State of New York, and because each Defendant committed acts and omissions giving rise to Plaintiff's claims in the State of New York.

## **THE PARTIES**

### **Plaintiff**

12. Plaintiff Lauren Blythe is an adult individual, born May 28, 1985, who was enrolled at FFS from February 12, 2001 through June 28, 2003, arriving at fifteen years of age, remaining in FFS's

custody as a minor until her eighteenth birthday on May 28, 2003, and remaining there, as an adult, under the same regime for one month more, until her graduation. Plaintiff currently resides in Pittsboro, Chatham County, North Carolina.

13. Prior to her placement at FFS, Plaintiff, a fifteen-year-old from Wilmington, North Carolina, had been tested for attention deficit disorder, with no diagnosis resulting, and was not engaged in any ongoing course of mental health treatment. Following an incident in which she was apprehended for shoplifting, her mother sought help for her. She was sent to FFS for counseling, structure, and an education.

14. FFS was recommended to Plaintiff's mother by an educational consultant in Richmond, Virginia, after a single one-hour appointment with Plaintiff. The consultant arranged Plaintiff's enrollment by telephone and represented to Plaintiff's mother that FFS would provide a safe place and counseling by a staff of psychologists, licensed therapists, and teachers, together with staff who had themselves recovered from drug and alcohol addiction. Plaintiff was enrolled within two days. Plaintiff's mother paid tuition and charges to Defendants of approximately $3,200 per month from February 12, 2001 through June 28, 2003, approximately $92,800 in all, by checks and payments transmitted through the United States mail and by interstate wire from North Carolina to New York, and incurred approximately $7,200 more in airfare, car rental, lodging, meals, and fuel for the trips to Hancock that the institution's visiting rules, Plaintiff's flights from the campus, and her graduation required. On information and belief, those payments were deposited to the School's operating account at NBT Bank, through its Pennstar Bank division, which had acquired that account, with its deposit history, from Sovereign Bank on November 10, 2000, three months before Plaintiff's arrival.

15. Plaintiff's mother flew with her from Raleigh, North Carolina to Binghamton, New York and delivered her to the FFS campus in Hancock on February 12, 2001, without either parent having toured the campus. On her arrival Plaintiff was taken into the institution's custody and processed as an inmate: her luggage and personal belongings were searched and the institution kept from her whatever its staff did not deem "appropriate" for her to have, and Plaintiff, then fifteen years old, was strip searched pursuant to FFS's intake policy by Jackie Petriella, the FFS staff member assigned to her as her "sponsor." No medical screening preceded the search, no parent was present, and no lawful authority permitted it. In the course of that search an item that had been surgically placed within Plaintiff's body during a prior gynecological procedure was dislodged; Plaintiff discovered the injury only afterward, when the item fell from her body while she showered. On information and belief, and consistent with FFS's uniform intake practice, Plaintiff was also photographed.

**Defendants**

16. Defendant Education Plus Corporation, doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise described herein operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which children, including Plaintiff, were recruited and confined. FFS misrepresented to parents that it provided qualified therapeutic, psychiatric, and psychological treatment services to enrolled students while it employed no qualified professionals with which to provide such services. In its final years of operation, FFS operated under the name Allynwood Academy.

17. Defendant Betty Argiros co-founded FFS together with her husband, Tony Argiros, and served as a founder, administrator, and Program Director of FFS throughout the period of Plaintiff's enrollment. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the family-unit structure, the sanction and work-labor system, the isolation and food sanction regime, the intake strip search practice, and the culture of institutional secrecy within which the conduct described herein was able to occur. FFS's own published Handbook stated that Tony and Betty Argiros were the heads of the household, that they represented the parents of the house, and that they had the final say on all matters and did not have to explain themselves to students.

18. Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who succeeded Tony and Betty Argiros as president of the FFS board beginning in 1993 and who owned, operated, and directed FFS and Education Plus Corporation in that capacity throughout Plaintiff's enrollment and through the school's closure in 2014. Defendant Argiros was, on information and belief, the custodian of the institution's student records, and personally destroyed evidentiary records by shredding, as described herein. Defendant Argiros currently owns and personally operates KASOS Enterprises LLC d/b/a Smith's Colonial Motel and Upper Delaware Inn in Hancock, New York, owns Kasos Co Family LP, which was an owner of the FFS real property, and owns K9-5 Inc.

19. Defendant Cindy Argiros, who publishes and is publicly known under the name "Cindy Ray" and as "Cindy Ray Argiros," is an individual who, on information and belief, is married to Defendant Emmanuel Argiros, and who, on information and belief, served during Plaintiff's enrollment as a family leader within FFS and supervised the sanctions, labor assignments, and food deprivation imposed upon its students. Defendant Cindy Argiros is the owner, editor, and publisher of Defendant The Hancock Herald, and is named in this action additionally with respect to the

fraudulent concealment alleged in Count XII and the fraudulent conveyance described herein, as a beneficial owner and controller, together with Defendant Emmanuel Argiros, of the Kasos entities and K9-5 Inc. described herein.

20. Defendant Jeffrey Brain a/k/a Jeff Brain is an individual who served in FFS's senior leadership as its Director of Admissions for approximately nine years through the school's 2014 closure, and as its Vice President for External Relations, in a tenure that began after Plaintiff's enrollment and continued the enterprise's marketing and concealment through its closure. As Director of Admissions, Defendant Brain directed the admissions and external relations apparatus through which the enterprise recruited and confined the children who followed Plaintiff, collected tuition, and concealed the conduct to which Plaintiff had been subjected. He is named as a Defendant with respect to the fraudulent concealment alleged in Count XII, the aiding and abetting of that fraud alleged in Count XIII, the enterprise concealment conduct alleged in Counts I and II, the knowing profit and advancement alleged in Counts V, XX, and XXI, and the obstruction of enforcement alleged in Counts XVIII and XIX. In his external relations capacity, Defendant Brain was the named contact for and, on information and belief, an author or approving officer of the institution's May 2008 public response to oversight hearings of the United States House of Representatives Committee on Education and Labor, in which the institution publicly minimized and mischaracterized the institutional practices alleged in this Complaint, including the practices to which Plaintiff had been subjected, continuing and maintaining the enterprise's concealment of that conduct and keeping the families of former students, including Plaintiff's, deceived as to what had been done to their children.

21. Paul Geer, who is not named as a defendant in this action, was employed by FFS from the 1990s through its 2014 closure, including as the director of its choir and as a staff member who organized

and supervised its trips, and on March 3, 2025 was convicted by a federal jury in this District, after a two-week trial, of federal sex offenses committed against FFS students, including the transportation of children in FFS's custody in interstate and foreign commerce for sexual activity, on trips to Maine in 1994 and to Toronto in 2001, and was sentenced on September 4, 2025 to 327 months in federal prison. On information and belief, and as established at his criminal trial, Geer had confessed sexual misconduct with students to FFS's administration before Plaintiff's enrollment, and, on information and belief, in or about 2001 a student whom Geer had sexually assaulted on a chorus trip to Toronto reported the assault to Defendant Emmanuel Argiros, and no report was made and no action taken; FFS, through the Argiros Defendants, kept Geer on staff and in the custody of children, including on its trips out of the State, throughout Plaintiff's enrollment, during which, in 2001, he transported FFS students to Toronto on the trip for which he was convicted.

22. Defendant Kasos Co Family LP is a New York limited partnership owned and controlled by the Argiros Defendants, which held title to the FFS real property and transferred it to Defendant Chapel Hill Land Holdings LLC in November 2014 at below-market value. Defendant Kasos Enterprises LLC is a New York limited liability company likewise owned and controlled by the Argiros Defendants.

23. Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016, in each case with actual or constructive notice of the claims against the transferors. On information and belief, Chapel Hill Land Holdings LLC is the acquisition entity of, or is affiliated with, the French Woods performing arts camp, the purchaser identified in the school's own closing announcement, which described the purchaser as

"a neighbor and friend of the school and the Argiros family for many years." On information and belief, institutional records of FFS that survived the destruction described herein remained on the former campus property after the 2014 closure, stored in an outbuilding on that property, within the possession and control of Chapel Hill Land Holdings LLC as its owner, for approximately a decade, and were never voluntarily disclosed or produced to law enforcement, being recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial. On information and belief, the November 2014 conveyance of the FFS campus was made for consideration of approximately two million dollars, a price materially below the value of the property conveyed, which comprised a multi-structure campus improved and maintained over decades by the uncompensated labor of FFS students, including Plaintiff. On information and belief, since acquiring the campus, Chapel Hill Land Holdings LLC and the French Woods camp with which it is affiliated have operated a residential summer camp on it, housing campers and staff in the dormitories, feeding them from the kitchen, and using the chapel, the fields, the grounds, and the outbuildings, so that the buildings and grounds that FFS children built, repaired, cleaned, and maintained without pay have been put to commercial use every season since, and Chapel Hill Land Holdings LLC continues to receive the benefit of that labor with each season it operates: on information and belief, the camp charges each camper's family tuition of thousands of dollars per session, up to approximately $16,000 per camper for a full summer, and the dormitories, dining facilities, chapel, fields, and grounds for which those families pay are the ones the children of FFS, including Plaintiff, built, repaired, cleaned, and maintained without pay. That benefit is not historical: it is received anew each year, on property whose improvement and upkeep were the children's work, by an entity that had been, in the school's own words, a neighbor and friend of the school and the Argiros family for many years, and

that, on information and belief, knew from that relationship how the campus it bought had been run. Chapel Hill Land Holdings LLC knew, or recklessly disregarded, what the property it took had been and how it had been built and kept, and it turned a blind eye to that knowledge because the transaction was profitable. It was not a purchaser without notice. It took the campus as a transferee with actual or constructive notice of the claims against its transferors, for less than its assessed value, from the family-controlled entity into which the Argiros family had moved the property when the State came to investigate, at a time when the School had been publicly accused, publicly investigated, and publicly closed, and it took it on the financing of the School's own secured lender, which released its liens on the School's collateral one month after the conveyance and took the buyer as its new borrower. Its principal, on information and belief Ronald Schaefer, the founder of the French Woods camp, sits on the board of Hancock Partners, Inc. under Defendant Emmanuel Argiros, the School's president, alongside the manager of the NBT Bank branch that handled the School's payroll; the School, the bank that held and lent its money, and the buyer that took its land are represented on one board by the people who ran them. The School's own closing announcement identified the purchaser as a neighbor and friend of the School and the Argiros family for many years. The buyer took the dormitories, chapel, kitchen, and grounds as they stood, built and maintained by children without pay, with the School's records in an outbuilding on the premises, and put them to paying use the next summer. Those are the facts of a party that knowingly benefits, financially and by receiving things of value, from participation in a venture it knew or should have known was engaged in forced labor: it received the venture's principal asset at a discount, from an insider, on the venture's own credit, with the venture's evidence on the property, and it has drawn revenue from that asset every season since. NBT Bank and Chapel Hill Land Holdings LLC profited from the same labor through the same property, the bank by lending against the collateral

the children built and taking its payoff when that collateral was sold, the buyer by acquiring and operating it, and both sit, through their principals, on the board of the corporation the School's president leads. The 2014 conveyance was not a sale to a stranger. It was the transfer of the enterprise's principal asset to a knowing beneficiary, on the enterprise's own bank's money, for less than it was worth, after the enterprise had been accused, and that is how both of them have kept it. Defendant French Woods Performing Arts Inc., doing business as French Woods Sports and Arts Center, is, on information and belief, a New York business corporation with its principal place of business at Hancock, New York, which operates the residential summer camp on the former FFS campus at 431 Chapel Hill Road and is the operator of record of that camp with the American Camp Association; it is, on information and belief, owned and directed by Ronald Schaefer, its founder, and Beth Schaefer, and is the entity through which the Schaefer family operates the French Woods camps. French Woods Performing Arts Inc. took possession of the campus at or about the time of the November 2014 conveyance and has operated it as a camp every season since, housing, feeding, and charging campers for the dormitories, dining facilities, chapel, fields, and grounds that the children of FFS, including Plaintiff, built and maintained without pay, at a charge, on information and belief, of approximately $4,500 per three-week session per camper and up to approximately $16,000 per camper for a full summer. Its directors and staff occupied and used the campus and its outbuildings each season from 2015 forward; on information and belief it had possession and control, with Chapel Hill Land Holdings LLC, of the outbuilding in which the School's records were kept, and it was the entity on the campus from which the Argiros family retrieved School records after the closure, as the Argiros family testified at the Geer trial. French Woods Performing Arts Inc. knew, or recklessly disregarded, what the campus it operated had been and how it had been built, and it has knowingly benefited, financially and by receiving things of

value, from participation in the venture by taking that campus as its inventory and drawing revenue from it every season since. On September 10 and again on September 29, 2026, Plaintiff's counsel served Chapel Hill Land Holdings LLC, through its attorneys, with a Notice to Preserve Evidence and a Notice and Request for Entry Upon Land for Inspection directed to the outbuilding on the former campus at 431 Chapel Hill Road and the records stored in it. On October 2, 2026, Chapel Hill Land Holdings LLC, through its attorneys, responded in writing that it "is not aware of any such shed," that "there is nothing to inspect," that it is "an innocent purchaser of land that has absolutely nothing to do with the events at issue in this litigation," and that it "will not make the premises available for inspection." A federal agent took part in the search of that campus under a federal warrant and recovered from it the School's records that were used at the 2025 criminal trial, as he testified under oath at that trial; Chapel Hill Land Holdings LLC now denies that the structure from which they were recovered is on the property. On information and belief, the outbuilding and the records within it existed on the campus, within the possession and control of Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc., when the notices were served, and the October 2, 2026 denial and refusal was a further act of concealment, made with knowledge of this litigation and of the federal proceedings that preceded it.

24. Defendant K9-5 Inc. is a New York corporation, formally incorporated in 2014 immediately after FFS ceased operations, to which the Argiros Defendants transferred the enterprise's canine operation and related assets, including the dogs for whose care and training FFS students, on information and belief, had been used as unpaid labor.

25. Defendant NBT Bank, N.A. is a federally chartered national bank that, directly and through its predecessor, has maintained a continuous banking presence in the Village of Hancock, New York since 1907, a period encompassing the entirety of Plaintiff's 2001-2003 enrollment and FFS's

operational life from its founding through its 2014 closure, and that was at all relevant times the sole commercial bank in a village of fewer than 1,200 residents. NBT Bank, N.A. ("NBT Bank") and NBT Bancorp Inc. ("NBT Bancorp") are referred to together as "NBT" only where an allegation applies to both. Allegations specific to either entity are pleaded as to that entity. From November 10, 2000, and at all relevant times thereafter, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and, on information and belief, in the names of its principals, through which the tuition payments, including, on information and belief, the tuition paid on Plaintiff's behalf from February 2001 through June 2003, the payroll of the institution's staff, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed. As the bank serving the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from that account relationship, and knew or should have known from the scale of that revenue and the publicly available record of FFS's unlicensed and abusive operation, including the August 1990 cease and desist order, that the institution from which it was receiving that benefit was operating unlawfully. The public record shows blanket security interests in Education Plus Corporation's operating assets filed in 2002, 2004, and 2006, covering the operation's equipment, inventory, accounts, general intangibles, and contract rights together with their proceeds, so that the bank's collateral included the tuition receivables and enrollment contracts themselves, including the contract under which Plaintiff was enrolled, the livestock Plaintiff tended, the gardens and grounds she kept, and, on information and belief, the food inventory she unloaded from Sysco's trucks; new security interests taken from both Education Plus Corporation and Kasos Co Family LP on November 19, 2008, months after the congressional hearings described herein; a recorded loan of six hundred eighty thousand dollars to Kasos Co

Family LP, the family entity then holding title to the FFS campus, on March 24, 2010; continuations of its filings in 2010, 2011, and 2013; Uniform Commercial Code termination statements filed on December 12, 2014, in the course of the wind-down, releasing the liens on the school's collateral while the banking relationship itself continued; and, on February 27, 2015, a new blanket security interest against Chapel Hill Land Holdings LLC. On information and belief, the bank's own underwriting and collateral standards required, as a condition of extending and continuing that secured credit, the inspection of the collateral and the campus, the appraisal of the campus, and the review of the operation's financial statements, and the bank repeatedly conducted those inspections and reviews over the life of the relationship; had it done so, it would have seen an operation whose only revenue was tuition, whose expenditures on the housing, feeding, and staffing of the children in its custody fell far below what any lawful residential facility spends, and whose margin was made by the children's unpaid labor, and whose capacity to repay depended on the continued confinement of those children; and if the bank did not do so, its departure from its own standards was a deliberate avoidance of the knowledge those standards exist to supply. On either footing, the bank knew or consciously avoided knowing. The bank did not need to ask anyone for the operation's financial records: it already held them, because the operation's accounts were the bank's own accounts, and every tuition deposit, every disbursement, and every payroll check passed through the bank's own ledgers. Federal law required NBT Bank, as a national bank, to maintain a program to know its customers and to detect and report suspicious activity, and under that program and the bank's own standards the bank was required to know who owned and controlled the School, the nature and purpose of its accounts, and the source of the funds that moved through them; that obligation did not end at the opening of an account but attached anew to each credit decision and each periodic review of the relationship, so that knowing what the School

was and how it made its money was not a matter of the bank's discretion but of its continuing legal obligation. The bank discharged that obligation, or was required to, at identifiable moments: on information and belief, when it acquired the School's account on November 10, 2000 and re-documented the acquired accounts in its own name; when it took its first blanket security interest in the School's receivables, inventory, and contract rights on December 2, 2002, and again at each renewal in 2004, 2006, 2008, 2010, 2011, 2013, and 2016; when it underwrote the March 24, 2010 mortgage; and when it financed the transferee in 2015. At each of those moments the bank was required, under the program federal law obliged it to maintain and under its own standards, to know its customer: who owned and controlled the School, the purpose of its accounts, the source and character of the funds moving through them, and the risk the relationship presented. On information and belief, in discharging that obligation the bank knew that the School's only revenue was tuition paid for children held in residential custody, that the payroll the bank itself cut and cashed carried no licensed psychiatrist, physician, or clinical professional, and that the School's expenditures bore no relation to the housing, feeding, and staffing of the children whose tuition it was; and if the bank did not know those things, it was because it did not perform the inquiry that federal law and its own standards required, a deliberate avoidance of the knowledge that inquiry exists to supply. On either footing the knowledge is the bank's. Because it was at once the depository and the secured lender, NBT Bank saw both sides of the operation. From its own ledgers it saw what came in, tuition paid for children held in residential custody, and what went out. From the appraisals and inspections its secured lending against the campus required, it saw what stood on the land it lent against and what was added to it from one credit renewal to the next: the dormitories, the chapel, the kitchen, the fields, and the grounds, improved, repaired, and maintained between inspections. On information and belief, the accounts the bank held showed no payments to

contractors, builders, or tradesmen commensurate with those improvements, and no payroll for the maintenance, custodial, kitchen, laundry, and grounds staff that a residential facility for that number of children requires, because the children were doing that work; the collateral the bank appraised grew while the expenditures that should have produced it did not appear in the accounts the bank held. On information and belief, the same inspections showed the bank the housing in which the children it lent against were kept, including converted barns and trailers in which the children slept in rooms fitted with multiple sets of bunk beds, several children to a room, and a plant that, on information and belief, could not lawfully house the number of children whose tuition the bank was taking in. On information and belief, NBT Bank appraised and lent against improvements for which no construction payments passed through the accounts it held, on a campus it had inspected and knew to be housing more children than its structures were built to hold, and it knew, or consciously avoided knowing, that those improvements were the children's work. The money paid for Plaintiff's enrollment did not leave the enterprise when she did. On information and belief, the tuition her family paid became the operation's receivables, deposits, and working capital, was spent on the operation's continuation and on the campus, inventory, and improvements against which the bank lent, and was carried, as the proceeds and the collateral of the enterprise, in the accounts and under the liens the bank held and renewed through December 18, 2021, so that the bank's obligation to know its customer, and its knowledge of what the customer was, attached not only to the years of Plaintiff's enrollment but to every year in which it continued to hold, lend against, and profit from what her family had paid. Neither the 2008 congressional testimony nor the 2014 closure and sale, nor the 2024 indictment, nor the 2025 conviction of Paul Geer, prompted the bank, on information and belief, to file a Suspicious Activity Report, or prompted it to make any report to any regulator or law enforcement agency, to freeze or hold any

account, funds, or transaction pending inquiry, as banks routinely do, or to decline the transactions before it; instead, on information and belief, the bank financed the conveyance of the campus, collected satisfaction of its own credit from it, and took the transferee as a new lending customer. NBT Bank's repayment under those instruments depended on the School's continued enrollment of children and continued receipt of tuition. Its return was not a fee on a customer's ordinary accounts but a stake in the operation itself, and its interest, like that of every Hancock business the School's revenue supported, was in that operation continuing. As the only commercial bank in the Village of Hancock, NBT Bank held the village's deposits, extended its credit, and financially sponsors the corporation whose stated purpose is to "combat community deterioration"; on information and belief, a substantial share of the Hancock branch's deposits and lending derived from the School's revenue and the families and businesses that revenue sustained, so that the bank's position in the village, like the village's, was bound to the School's survival. NBT Bank's relationship with the School's president was institutional, not personal. NBT Bank is a member, in its own name, of the Hancock Area Chamber of Commerce, is listed in the Chamber's directory as its banking member on a website published by the Town of Hancock, and pays its dues into a treasury Defendant Emmanuel Argiros keeps as the Chamber's treasurer. NBT Bank financially sponsors Hancock Partners, Inc., the economic-development corporation Defendant Emmanuel Argiros presides over, and Dawn Joyce, the manager of NBT Bank's Hancock branch for approximately eighteen years, whose duties included the School's accounts and credit, serves under Defendant Emmanuel Argiros as a director of that corporation. Her knowledge of the School, its finances, and its president, acquired in managing the branch that held the School's accounts and administered its credit, was material to her duties and is the knowledge of NBT Bank. The relationship ran in both directions. NBT Bank receives, through the same apparatus, the

promotion of its own business: it is held out, on the Chamber of Commerce directory the Town publishes, as the community's bank, the only banking member listed, in a directory kept by the School's president as the Chamber's treasurer; through its branch manager's seat on the Partners board it is placed before the businesses and projects that corporation serves, under a president who was the bank's customer; and, on information and belief, it has drawn deposits, loans, and customers from that standing. That standing, conferred through organizations the School's president ran and whose own revenue depended on the School, was a thing of value the bank received from the relationship and had reason to keep. NBT Bank did not open the School's operating account; it bought it. On November 10, 2000, NBT Bank, through its Pennstar Bank division, purchased six branches of another bank, with approximately $96.8 million in deposits, including the branch at which the School's operating account was maintained, and from that date the School's account, its number and history unchanged, was an NBT Bank account, so that by the time the tuition for Plaintiff's enrollment was paid, from February 2001 through June 2003, the School's account was an NBT Bank account, and that tuition was, on information and belief, deposited with NBT Bank through its Pennstar Bank division and its Hancock office. NBT Bank's own statements to its stockholders describe the position from which it saw the School. In its investor materials NBT Bank reported that, as of June 30, 2010, it ranked first among all banks in Delaware County, New York, where the School sat, with five branches and more than a quarter of all deposits in the county, and third in Susquehanna County, Pennsylvania, where the School's operating account was kept, with six branches and more than a fifth of the county's deposits; that in thirty of the communities it served it was the only bank in town; and that its strategic focus was organic growth, "particularly in the area of core deposits." When it formed Pennstar Bank from the Pennsylvania branches it acquired in 2000, its chief executive described the strategy as

"maintaining the local decision making and high service levels that are essential elements of our community banking philosophy." On information and belief, consistent with those statements, decisions concerning the School's accounts and credit were made locally, by officers in the Hancock and Montrose offices who saw the School, its president, and its money directly, and the School's deposits were the kind of core deposits NBT Bank identified as its principal object of growth and the foundation of its lending. On information and belief, the bank's payroll ledger for the enterprise records every paycheck issued to Paul Geer from the 1990s through the 2014 closure, that is, for the entire period after FFS's administration had been told of Geer's confessed sexual misconduct with students and had decided to keep him; the bank processed and cleared those payments, held the record of them, and, after the 2024 indictment and the 2025 conviction publicly established what they had paid for, did not review, freeze, report, or otherwise act upon the accounts through which Geer had been paid or the accounts of the principals who had paid his. On information and belief, the bank likewise took no step, after the indictment or the conviction, to freeze, review, or report the accounts of Chapel Hill Land Holdings LLC, the transferee whose acquisition of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call, terminate, or withdraw the credit it had extended against that property, so that the bank remains today the financier of the entity that holds the enterprise's principal asset.

26. Defendant NBT Bancorp Inc. is a bank holding company headquartered in Norwich, New York, and the sole owner of Defendant NBT Bank. NBT Bancorp is sued for its own conduct and not merely as the owner of NBT Bank.

27. NBT Bancorp acquired the School's banking relationship in November 2000, when Pennstar Bank, N.A., then its wholly owned subsidiary, purchased six branches of another bank in

northeastern Pennsylvania, including the branch that held the School's accounts. NBT Bancorp reported that acquisition as its own. In March 2001, NBT Bancorp merged Pennstar Bank into NBT Bank, which continued the relationship through its Pennstar Bank division and its Hancock branch.

28. On information and belief, NBT Bancorp sets the credit, underwriting, know-your-customer, anti-money-laundering and suspicious-activity-reporting policies under which NBT Bank opened, maintained and monitored the School's accounts and extended and secured the School's credit. NBT Bancorp's executive management includes a chief credit officer and a chief risk officer, who oversee the credit and risk functions of its banking operations. NBT Bancorp is compensated for that management. Its revenue consists principally of the management fees and dividends it receives from its subsidiary bank.

29. NBT Bancorp holds itself out to the public and its shareholders as operating a community banking business through local decision-making by officers in each market. It reports the deposits, loans and market position of the Hancock and Delaware County markets as its own, and it represents that its banking operations comply with the Bank Secrecy Act and the USA PATRIOT Act.

30. From December 2, 2002 through December 18, 2021, without interruption, NBT Bank, N.A., directly and through Pennstar Bank, a division of NBT Bank, N.A., held one or more perfected security interests in the collateral of Education Plus Corporation. The public record shows blanket security interests filed against Education Plus Corporation in New York on December 2, 2002, January 30, 2004, May 30, 2006, and November 19, 2008, and in Pennsylvania on December 18, 2006; a security interest filed against Kasos Co Family LP on November 19, 2008; continuations filed on December 13, 2010, June 21, 2011, and October 31, 2013; the mortgage loan of March 24, 2010 to Kasos Co Family LP against the campus; the New York releases of December 12, 2014;

and a Pennsylvania continuation filed on September 15, 2016. That secured position began in the middle of Plaintiff's enrollment, twenty-two months after her arrival, on collateral her labor and the labor of the children before and after her had built and maintained, and outlasted the school's closure by seven years.

31. On December 12, 2014, one month after Kasos Co Family LP conveyed the campus to Chapel Hill Land Holdings LLC, NBT Bank released its New York liens on the school's collateral. On February 27, 2015, NBT Bank filed a new blanket security interest against Chapel Hill Land Holdings LLC covering its equipment, fixtures, inventory, accounts, contract rights, general intangibles, timber, and oil, gas, and minerals, a lien that remained in force through February 27, 2020. On information and belief, NBT Bank's loan to Chapel Hill Land Holdings LLC funded the conveyance of the campus, and NBT Bank was repaid its own credit to the school from the proceeds of that conveyance.

32. On September 15, 2016, nearly two years after the school closed, NBT Bank renewed its blanket security interest in the collateral of Education Plus Corporation by continuation, so that NBT Bank held that lien every day through December 18, 2021. Under the Uniform Commercial Code a perfected security interest lapses five years after filing; it can be continued only by a continuation statement filed within the six months before lapse and only with the secured party's authorization; and absent that filing NBT Bank's lien would have ended on December 18, 2016. NBT Bank chose to continue it. On information and belief, NBT Bank collected interest, fees, and other charges on its secured credit throughout that period.

33. NBT Bancorp, with the knowledge alleged below, received the benefit of every deposit, fee, interest payment and security interest NBT Bank obtained from the enterprise. It reported those deposits, loans and the collateral securing them as its own consolidated assets and revenue. On

information and belief, it received the earnings from them through the dividends and management fees NBT Bank pays it.

34. NBT Bancorp's interest in the School's continued operation was the same as NBT Bank's. Repayment of the School's credit, and the value of the collateral securing it, depended on the School continuing to enroll children and collect tuition.

35. NBT Bancorp's knowledge is its own and is also imputed to it. The facts known to Dawn Joyce, the manager of NBT Bank's Hancock branch, and to the officers who approved and administered the School's credit were acquired in carrying out policies NBT Bancorp set. On information and belief, those facts were reported through the credit, risk and compliance functions NBT Bancorp's executive management oversees.

36. The security interests NBT Bank took in the School's revenue beginning in December 2002 and renewed in November 2008, and the loan NBT Bank made in March 2010, were extended under NBT Bancorp's credit policies. On information and belief, they were reviewed under NBT Bancorp's credit approval and audit processes.

37. In all of its dealings with the School, the Argiros family and their entities, NBT Bank acted as NBT Bancorp's agent, within the scope of the authority and policies NBT Bancorp conferred and for NBT Bancorp's benefit.

38. NBT Bancorp ratified that conduct by accepting its benefits and reporting them as its own. It also ratified that conduct by continuing the relationship after the May 2008 congressional testimony, the School's 2014 closure and the April 2024 indictment, and, on information and belief, by never reporting the enterprise to law enforcement.

39. On information and belief, as of the filing of this action NBT Bank still holds the accounts of the Argiros family, of Kasos Co Family LP and Kasos Enterprises LLC, of K9-5 Inc., and of

Chapel Hill Land Holdings LLC, and holds the proceeds of the enterprise's assets, and it has never terminated its relationship with the enterprise or its principals. On information and belief, NBT Bank placed no hold on any of those accounts and made no disclosure to any authority at the April 2024 indictment of Paul Geer, at the execution of the federal search warrant on the former campus, during the February 2025 trial, or upon the March 3, 2025 conviction, and has not provided its records of the enterprise to the federal authorities handling the Family Foundation School matter.

40. Defendant Sysco Syracuse, LLC is a Delaware limited liability company with its principal place of business in Warners, New York, and is the Sysco Corporation operating subsidiary whose central New York distribution territory includes Delaware County, New York. On information and belief, Sysco Syracuse, LLC distributed food and institutional supplies to FFS on a recurring, scheduled basis during the relevant period, delivering by truck to the FFS campus, and was paid for those goods and deliveries from the tuition-funded accounts described herein, while students at the institution, including, on information and belief, Plaintiff, unloaded those deliveries as part of the uncompensated labor described herein. Defendant Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas, and is the controlling parent of Sysco Syracuse, LLC, named in that capacity (together with Sysco Syracuse, LLC, "Sysco").

41. Defendant The Hancock Herald is the local newspaper serving the Village of Hancock, owned and controlled at all relevant times by Defendant Cindy Argiros, a principal of the enterprise, which published promotional content concerning FFS furthering the enterprise's fraudulent marketing of the school while not reporting the 1990 cease and desist order, the 2008 congressional oversight hearings into the institution held after Plaintiff's enrollment, or other matters of public concern regarding FFS's operation.

42. Defendant Village of Hancock, New York is a municipal corporation organized under the laws of the State of New York, sued individually and through the Village of Hancock Police Department ("Hancock PD"), the municipal police department owned, operated, funded, and controlled by the Village and through which the Village acted in the events described herein, including the standing practice of locating children who fled FFS and returning them to the institution's custody, on information and belief using the intake photographs the institution supplied to its officers.

43. Defendant Town of Hancock, New York is a municipal corporation organized under the laws of the State of New York, separate and distinct from the Village of Hancock, within whose borders the FFS campus at 431 Chapel Hill Road is located. At all relevant times, including during Plaintiff's enrollment, the Town exercised governmental authority over the territory on which FFS operated and possessed the official notice of FFS's unlicensed operation described herein, including, from December 2010, the joint findings of four New York State agencies that former students' accounts of abusive practices were credible, yet permitted FFS to continue operating. Defendants NBT Bank, Chapel Hill Land Holdings LLC, the Hancock Herald, the Village of Hancock, and the Town of Hancock knew, or recklessly disregarded, what the School was, and each turned a blind eye to it because the relationship was profitable. The reasons were financial, and they were the town's. The campus was purchased, as the School's president testified at the 2025 Geer trial, with a down payment contributed by affluent members of the Hancock community, so that from its founding the School was an investment of the town's own money, made in a village that, on information and belief, was losing a tenth of its population in those years and had no other enterprise of its size to replace what it was losing. For the next quarter century the School's revenue, approximately $40,000 per child per year during Plaintiff's enrollment and far more thereafter, paid for by families from outside the town and deposited inside it, was one of the largest sources of payroll,

purchasing, lodging, and patronage in a village of fewer than 1,200 people. A town that small, losing people, has one objective in its commerce, which is to keep what it has; and from 2006 forward the man charged with that objective was the man who ran the School. In 2006 Defendant Emmanuel Argiros joined the board of Hancock Partners, Inc., the economic-development corporation whose stated purpose is to combat community deterioration, served as its vice president and treasurer, and has been its president since 2022; he is also the treasurer of the Hancock Area Chamber of Commerce; and the Town of Hancock publishes both organizations' websites. The institutions whose function was to keep Hancock's commerce going were, from 2006, run by the owner of the commerce they were keeping, and the School was that commerce. Every other institution with a reason to look at the School had a larger reason to keep it open. NBT Bank held the School's deposits, lent against its receivables and its land, and could be repaid only if children kept arriving and parents kept paying; its benefit was not only the interest and fees it earned for nineteen years on that credit, its payoff from the 2014 sale, and its loan to the buyer, but the relationship itself, which it chose to continue, through every notice event described herein, rather than lose the School's deposits, its credit, and the payroll and household accounts that depended on them. Chapel Hill Land Holdings LLC and the French Woods camp of Ronald Schaefer, who on information and belief is a principal of Chapel Hill, bought the campus below its assessed value and have charged campers to use the buildings the children built every summer since. The Hancock Herald, which Defendant Cindy Argiros ran under the name Cindy Ray, drew its advertising from the Argiros family's businesses and printed the School's promotional content rather than the complaints against it. The Village and the Town took the School's payroll, its purchasing, and its visitors as the local economy, and their police returned the children who ran. Each of those institutions saw the School from the inside: the bank saw the money come in and the

collateral it was lent against, the Herald covered the campus, the buyer was a neighbor and friend of the family for many years, and the Village's own officers walked escaped children back through its gates. And the people who ran them sat at one table, under Defendant Argiros: NBT Bank is a member of the Chamber whose treasury he keeps and sponsors Hancock Partners, on whose board the manager of NBT Bank's Hancock branch, Dawn Joyce, and, on information and belief, Ronald Schaefer, sit under him. The knowledge of the branch manager who sat on the School president's board was the knowledge of NBT Bank, because she acquired it in the course of the very relationship the bank employed her to manage; and each Defendant, having that knowledge or recklessly disregarding it, chose the relationship over the children, through the 1990 cease and desist order, the 2008 congressional hearings, the 2010 findings of four State agencies, the 2014 closure and conveyance, the 2024 indictment, and the 2025 conviction. Nothing has changed since. On information and belief, as of the filing of this action, after the April 2024 federal indictment of a longtime FFS staff member for crimes against FFS children, after the February 2025 public trial at which the School's president admitted under oath that its records had been destroyed, after the March 3, 2025 conviction, and after the commencement in 2026 of more than twenty actions in this District alleging the conduct described herein against the same Defendants, Defendant Emmanuel Argiros remains the treasurer of the Hancock Area Chamber of Commerce and the president of Hancock Partners, Inc.; NBT Bank remains a member of the Chamber and a sponsor of Hancock Partners, its branch manager remains a director under him, and it remains the holder of the accounts described herein and the lender to the entity that holds the campus; the French Woods interests remain on that board and in operation on the campus; and no Defendant has suspended, removed, or disassociated from any of them, called or withdrawn any credit, closed any account, or disclosed anything to any authority.

44. Defendant Delaware County Sheriff's Office is the law enforcement agency for Delaware County, New York, in which FFS is located, and Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County. Defendant County of Delaware, New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period and which is the entity liable for the customs, policies, and practices of the Sheriff's Office and Board of Supervisors alleged herein.

45. Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, including FFS, which was a founding member of NATSAP. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and marketing materials, which were used by parents, by education consultants, and by referring programs, as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS throughout the period of FFS's membership and knew or should have known that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed.

46. Rita Argiros, who died in 2015 and is not named as a defendant in this action, was the daughter of FFS's founders, the sister of Defendant Emmanuel Argiros, and the daughter of Defendant Betty Argiros. In 2000, before Plaintiff's enrollment, Rita Argiros became the Executive Program Director of FFS, a role in which, by her own published account, she reshaped the practices and procedures of the school, and in which she held authority throughout Plaintiff's enrollment over the sanction, labor, isolation, and food regime imposed upon Plaintiff, and she founded the school's

canine program, known as the Dog Corps, which she ran with the unpaid labor of FFS students. Rita Argiros was simultaneously the founder and president of the search dog organization named in the following paragraph. Her conduct is alleged as conduct of the enterprise and of Education Plus Corporation.

47. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., doing business as Eagle Valley Search Dogs ("Eagle Valley"), is a New York not-for-profit corporation with a principal place of business in Wurtsboro, New York, founded and presided over by Rita Argiros. Upon information and belief, throughout Plaintiff's enrollment the enterprise's canine operation and Eagle Valley's operation were conducted in common by the same Argiros family principal; the unpaid labor of FFS students, who walked, fed, cared for, and served as training subjects for the school's dogs, supported the care, maintenance, and training of dogs from which Eagle Valley's operation benefited; the kitchen, grounds, livestock, and custodial labor of the student body as a whole, including Plaintiff's, ran the institution within which that canine operation was housed, fed, and maintained; and Eagle Valley thereby maintained, through its own founder and president, a continuous relationship with the enterprise, knew, through her, of its nature, and knowingly benefited from the forced labor of the children in its custody.

48. Jan Cheripko, who died in 2024 and is not named as a defendant in this action, was employed for ten years, from 1990 to 2000, by Boyds Mills Press, the book publishing arm of the Highlights organization, during a period in which he was also involved at FFS as a part-time English teacher; joined FFS full-time in 2000, before Plaintiff's enrollment; served as an FFS English teacher and, from approximately 2001, as a family leader; and remained at FFS until June 2013, while remaining a Boyds Mills author. Through Cheripko, the publishing organization named in the following paragraph was embedded in the purported education the enterprise sold to paying

families and had, in its own longtime employee and author, direct knowledge of the institution's practices.

49. Defendant Highlights for Children, Inc. and Defendant Boyds Mills (formerly the Highlights Foundation) (together, the "Highlights Defendants") are affiliated entities that publish the Highlights magazines and operate, among other things, a retreat property of approximately 1,300 acres in Wayne County, Pennsylvania. The January 2026 renaming of the Highlights Foundation as Boyds Mills reflects an unbroken continuity of the same entity. The Highlights Defendants' publications and programs were integrated into the purported education for which the enterprise's families, including Plaintiff's, paid: upon information and belief, FFS purchased Highlights publications for use in the school's purported educational program with tuition-funded money, so that a portion of the tuition extracted from the enterprise's families flowed directly to the Highlights Defendants; the uncompensated forced labor of the children subsidized the operation from which those payments were made; and, on information and belief, FFS students were brought to the Highlights Defendants' Wayne County retreat, where they performed uncompensated labor from which the Highlights Defendants benefited. The Highlights Defendants thereby knowingly benefited, financially and by receiving things of value, from a venture engaged in forced labor, labor trafficking, and sex trafficking as alleged herein, and knew or should have known, through Cheripko, their own longtime employee and author embedded on the campus, of the nature of that venture.

## FACTUAL ALLEGATIONS

### A. The Family-Unit Structure and Institutional Control

50. When Plaintiff arrived at FFS in February 2001, the school's population was divided into several "family" units, each housed and supervised separately. Plaintiff was assigned to Family

Two, under its family leaders, Roxy Losicco and Michael Losicco, who were agents of the School, and remained in that unit, in their custody and under their control, throughout her enrollment. FFS's institutional structure vested near-total control over students' daily lives, movement, dress, and contact with their families in the family-unit staff and in the senior students and staff members they deputized as "sponsors," a structure that both enabled and concealed the conduct described herein.

51. Control was enforced through a system of "sanctions," punishments imposed at the discretion of staff and of the senior students acting at their direction, including, in Plaintiff's case, work sanctions, the humiliation sanctions described herein, "blackout," under which a student was cut off from all contact with her family and from the privileges the institution otherwise allowed, the "poverty sanction," and the withholding of visits, each of which set a student back in "the program," so that each sanction extended the time the student would remain at the school and the tuition and charges the institution would collect for her. The students lived in constant fear of being singled out for sanction, a fear FFS cultivated deliberately and used as its principal instrument of control. Plaintiff, who sought to comply with every demand made of her, was made a dormitory leader as a disciplinary measure, a designation that increased rather than diminished the labor and responsibility demanded of her.

**B. Referral, Transport, Marketing, and Financial Inducement**

52. Plaintiff was placed at FFS through the referral network on which the enterprise depended: an educational consultant in Richmond, Virginia, after a single one-hour appointment with Plaintiff, recommended FFS to Plaintiff's mother, arranged the enrollment by telephone, and represented that FFS would provide a safe place and counseling by a staff of psychologists, licensed therapists, and teachers, together with staff in recovery from their own addictions. On information and belief,

the same consultant referred other children, including at least one of Plaintiff's own friends, to FFS during the same period. FFS marketed itself to prospective families and to the consultants who referred children to it through its promotional materials and its representations that it was a qualified therapeutic institution staffed to provide psychological, therapeutic, and addiction treatment and a high school education. Plaintiff's mother relied on those representations in placing Plaintiff at FFS within two days of the consultant's recommendation and in paying tuition and charges to Defendants of approximately $3,200 per month over twenty-nine months, approximately $92,800 in all, together with approximately $7,200 in travel costs the enrollment required, by checks and payments transmitted through the United States mail and by interstate wire from North Carolina to New York.

53. Plaintiff's mother flew with her from Raleigh, North Carolina to Binghamton, New York and delivered her to FFS on February 12, 2001, without either parent having toured the campus. Plaintiff was taken into FFS's custody on arrival, and from that day until June 28, 2003 Plaintiff remained in FFS's custody and control, on a campus from which she could not leave, with her contact with her mother withheld entirely for the first months of her enrollment and thereafter monitored, rationed, and withheld as a sanction.

**C. Compelled Strip Search, Physical Injury, and Photography**

54. Immediately upon her arrival at FFS, Plaintiff, then fifteen years old, was strip searched pursuant to FFS's intake policy, without medical screening, parental consent, or lawful authority. The search was carried out by Jackie Petriella, the FFS staff member assigned to Plaintiff as her "sponsor." No one asked Plaintiff about her medical history before the search. In the course of it, an item that had been surgically placed within Plaintiff's body during a prior gynecological procedure was dislodged; Plaintiff discovered the resulting injury only afterward, when the item fell from her

body while she showered. The search was not the admission of a student but the booking of an inmate, and it was the institution's first lesson to the child now in its custody. On information and belief, and consistent with the uniform institutional practice applied to every child admitted to FFS, Plaintiff was photographed in the course of that intake and the photograph was retained by the institution. On information and belief, FFS photographed every student at or shortly after intake, photographing students from the chest up as a baseline and photographing the entire body of any student who bore a tattoo, scar, or other distinctive mark, including students who were photographed naked; the images were captured on self-developing instant film and placed directly into books that the institution maintained and retained through at least its 2014 closure, and were never sent to any outside developer.

55. On information and belief, FFS supplied copies of students' intake photographs to local law enforcement, including Hancock PD and the Delaware County Sheriff's Office, as part of a standing arrangement under which officers used the institution's photographs to locate students who fled the campus and to return them to the institution's custody, and officers did use the institution's photographs for that purpose during the period of its operation.

**D. The Denial of Treatment and Education**

56. FFS accepted Plaintiff with knowledge that she was a fifteen-year-old sent to it, after a shoplifting incident, for counseling and structure, and on the representation, made through the consultant who placed her, that she would be counseled by psychologists and licensed therapists. FFS employed no psychologist, psychiatrist, or physician on its staff. During her twenty-nine months of enrollment Plaintiff was not seen by any psychiatrist, psychologist, or licensed therapist; no one evaluated, diagnosed, or treated her; and the prayer services, twelve-step meetings, confrontation groups, and table topics FFS substituted for treatment were not treatment. As the

institution's president, Defendant Emmanuel Argiros, admitted under oath at the 2025 federal criminal trial described herein, he was neither a clinical psychologist nor a certified teacher, his parents, the institution's founders, had no training in pedagogy, and the institution nonetheless marketed itself as a therapeutic boarding school.

57. The schooling FFS provided was subordinated to its sanction and labor regime and prepared Plaintiff for nothing beyond it. She was graduated on June 28, 2003 without ever having been taught how to study, how to prepare for an examination, or how to sustain academic work on her own, and in the years that followed she attempted college repeatedly and was unable to remain enrolled. Her mother paid approximately $92,800 for an education that did not equip her daughter to continue it.

**E. Forced Labor**

58. Throughout her enrollment, Plaintiff performed uncompensated institutional labor imposed as a condition of her confinement and as a disciplinary and control measure rather than as any part of a genuine therapeutic or educational program, every assignment of which was performed under threat of sanction, blackout, the extension of her time in "the program," and the loss of contact with her mother. Plaintiff was made to clean the pens in which FFS kept its pigs, which were infested with fleas, and to tend those animals; to shovel the institution's snow; to work its gardens and keep its grounds; and, as dormitory leader, to carry the institution's supervisory and housekeeping burdens within her family unit. After each of her flights from the campus she was placed on work sanction, cleaning the property and carrying cinder blocks back and forth, labor whose only product was the child's exhaustion. FFS also assigned Plaintiff, in rotation with other students, to sit "isolation watch": hours-long shifts, around the clock, guarding a child the institution had confined in a small, carpeted isolation room that smelled of urine and feces, so that the custodial

supervision of its most distressed children was performed not by staff but by the children themselves. FFS also transported Plaintiff out of the State of New York to a religious retreat house in Pennsylvania where, under the direction of a man the students knew as "Father Steven," she was made to perform landscaping and construction labor in connection with the building of a new sanctuary at that facility.

59. This forced labor, imposed on a minor in Defendants' custody and substituted for the counseling and education for which her mother was paying, was neither incidental nor therapeutic; it was uncompensated labor, extracted from a child, under threat of continued confinement, isolation, and further sanction, and it kept the institution's livestock, cleared its paths, raised its produce, kept its grounds, and guarded its isolation room, displacing the wages the institution would otherwise have had to pay for farm, grounds, custodial, and overnight supervisory staff, and it built a sanctuary for a third party.

60. Among that labor, FFS assigned student crews to receive, unload, and stock the institution's commercial food deliveries, including the recurring truck deliveries made by Sysco, in the presence of Sysco's drivers and delivery personnel, who returned to the campus on a regular delivery schedule and repeatedly observed minor children performing that labor. On information and belief, Plaintiff was among the students who received the distributor's goods from its trucks and carried them into the institution's kitchen and storage areas during her enrollment.

**F. The Sanction Regime, Blackout, Restraint, and the Censorship of Family Contact**

61. FFS subjected Plaintiff to a sanction regime of sustained verbal abuse and public degradation directed at her body. As one sanction, Plaintiff was made to sit with raw meat on her lap because FFS staff told her that she "treated her body like a piece of meat," language staff used to brand a fifteen-year-old girl as promiscuous before her peers. In a related and contradictory pattern of

sanctions, staff first faulted Plaintiff for insufficient attention to her personal appearance and required her to "dress up," and then, after she complied, condemned her as "too vain" and imposed a "poverty sanction" requiring her to wear plain, baggy clothing, to wear her hair pulled back, and to go without makeup so that she would not be "attractive." No conduct could satisfy both demands, and none was meant to. The same staff, Roxy and Michael Losicco, blamed Plaintiff before her family unit for a scabies outbreak that reached the dormitory months after her arrival, screaming at her that she was dirty and had brought it in; when she cried at the table she was told that crying was manipulation and that she was wearing a "puppy dog" look on purpose, and she was sent to sit in a corner without shoes until she could change her face; and her tiredness, her grades, and her play on the softball team Michael Losicco coached were treated as proof of "dishonesties" and of "lust." At her first permitted visit, six months after her arrival, Plaintiff was required to read aloud to her mother, in a room with Michael Losicco, Roxy Losicco, and Jackie Petriella, a written list she had been made to prepare of every sexual encounter and every wrong she could recall, as the institution's version of a twelve-step "fourth step," and then to listen while Michael Losicco told her mother what a terrible child she was and that she did not deserve the visit. When Plaintiff's grandfather died, the institution tried to persuade her mother not to let her attend the funeral, and when she returned from it grieving, staff told her that her grief was a manipulation to get sent home, made her stand in a corner, without shoes and forbidden to speak to anyone but her sponsor, for weeks, stripped her of the pin and senior standing she had earned, and placed her under the "shadow" of another student. This regime of contradictory, sexualized shaming sanctions served no therapeutic purpose; it was calculated to degrade and humiliate Plaintiff and to reinforce her dependence upon and submission to the institution. Plaintiff does not allege that she was sexually abused by FFS staff.

62. FFS also used food as an instrument of control. Students were required to finish everything on their plates. Plaintiff, a vegetarian when she arrived, was made to eat meat and was ill for weeks without anyone at the institution addressing it. On an evening when the institution served a dish containing pine nuts, to which Plaintiff was, unknown to her, severely allergic, she reported to Roxy Losicco that her mouth and throat were itching; Losicco told her to stop lying and finish her meal. Plaintiff went into anaphylactic shock and was given an epinephrine injection by the institution's nurse. No physician saw her, no paramedics were called, and there was no follow-up of any kind. When the family unit did not make the grades the institution demanded, condiments were withheld from every child in it.

63. During Plaintiff's enrollment, FFS staff and senior students acting at staff direction also physically restrained students by wrapping them in blankets or rugs and binding them, the practice that the institution, in its May 2008 public response to congressional oversight, characterized as a benign safety measure modeled on first aid for seizures, and confined students overnight in isolation under the watch of staff or senior students. Plaintiff saw that restraint practiced on her first day at the institution, a boy rolled inside a length of carpet and bound with duct tape, and was told not to concern herself with it; and she was herself assigned, as described herein, to sit the watches over the isolation room. As established by evidence at the 2025 federal criminal trial described herein, including the institution's own enrollment agreement and the trial testimony of Defendant Emmanuel Argiros, FFS billed the families of the children it isolated overnight a charge of $150 per night for that confinement, entered on the institution's billing under the description "night watch," a description that did not disclose to the families what the charge was for, so that the institution charged families for the isolation of their children while concealing from them what

they were paying for. On information and belief, that billing practice was in force throughout Plaintiff's enrollment.

64. FFS staff limited, monitored, and censored students' contact with their families. FFS's Handbook required that all outgoing student mail be read and initialed by a staff mentor and all incoming mail be read by staff, barred any telephone contact for the first month of enrollment and thereafter limited students to staff-dialed calls of a few minutes each, and authorized mail and phone blackouts as sanctions. For the first three months of Plaintiff's enrollment her mother was permitted no telephone contact with her at all, and for six months no visit; thereafter telephone calls were limited to nine minutes, staff-dialed and monitored, letters in both directions were read by staff before delivery, and visits were sparse and permitted only at the discretion of staff, conditioned on Plaintiff's "behavior" and withheld whenever she was on "blackout." Plaintiff wrote to her mother that she was "fine," because, as staff themselves acknowledged to her mother, a child who wrote otherwise faced blackout or the loss of privileges. Plaintiff and her family unit were placed on "family blackout" repeatedly, and during those periods letters continued to go to Plaintiff's mother over Plaintiff's name that were not in Plaintiff's handwriting, stating that Plaintiff was not following the program, that she was behaving terribly, and that she did not deserve the privilege of speaking to her family; Plaintiff's mother kept those letters. On one occasion Plaintiff's mother flew from North Carolina to New York for a scheduled visit and the institution cancelled it on her arrival, telling her that Plaintiff had been "dishonest" and that the visit would be manipulative and would make her worse, so that mother and daughter did not see each other. Plaintiff's mother accordingly never observed the conditions of her daughter's confinement.

**G. Flight and Return**

65. On at least two occasions during her enrollment, Plaintiff attempted to escape her confinement at FFS. On one occasion, while at a doctor's appointment in Binghamton, New York, to which the institution had transported her, Plaintiff fled on foot and hitchhiked before surrendering herself at a police station, from which she was returned to FFS. On another occasion, Plaintiff made her way off the campus into the town of Hancock, where she was located by an FFS employee and returned to the school. The institution summoned Plaintiff's mother, who traveled to Hancock at her own expense to assist in locating her daughter and returning her to the institution's custody. On neither occasion did any investigation occur, by the institution, by the police to whom she had surrendered, or by anyone else, into the conditions that had led a child to flee; each escape resulted only in her continued confinement and in sanction. Plaintiff, like every child at FFS, understood thereafter that flight was futile, because the institution's staff and the local police would return any child who ran.

**H. Transport Off the Campus**

66. During her enrollment, FFS transported Plaintiff, a minor in its custody, off the campus and out of the State in the custody of its staff, including across the state line to the religious retreat house in Pennsylvania described herein, where she was put to construction and landscaping labor, to a medical appointment in Binghamton, New York, and to twelve-step meetings in the community attended by adult strangers, at which the children were told that they were the same as the adults in the room, and, on information and belief, to the Highlights Defendants' retreat in Wayne County, Pennsylvania, where FFS students performed uncompensated labor. On each trip Plaintiff remained subject to the same rules, sanctions, and control as on the campus, and was returned from it to the campus and to the regime described herein. Throughout that period the institution kept in charge of its trips off the campus a staff member, Paul Geer, who had confessed sexual misconduct

with students to its administration, who during Plaintiff's enrollment transported FFS students to Toronto on the trip for which he was later convicted, and who has since been convicted of transporting FFS students on such trips for the purpose of criminal sexual activity.

**I. Plaintiff's Departure**

67. Plaintiff turned eighteen in FFS's custody on May 28, 2003 and was graduated from the institution a month later, on June 28, 2003, after twenty-nine months. She returned home to Wilmington, North Carolina with a diploma, no treatment, and no plan, having been taught that flight was futile and that she was the one in the wrong. Within weeks of her return the compliance the institution had produced fell away, because it had been the product of fear, not treatment. Plaintiff enrolled at a small college in North Carolina and did not complete a semester; she had been passed through FFS's classes without ever getting beyond tenth-grade mathematics and without being taught how to attend, study, or function as a student, and the attempts at college that followed over several years ended the same way. In the years after her release she returned to drugs and alcohol and to the pattern of relationships from which she had been sent to FFS to be protected, worse than before. She has supported herself since through her own art business, built without the education her mother paid for. FFS retained the tuition it had been paid for twenty-nine months of counseling and education it did not provide.

**J. FFS's Documented Unlicensed Operation and Pattern of Concealment**

68. FFS's unlicensed and abusive operation was a matter of public record throughout Plaintiff's enrollment: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license required by New York law. Defendants continued to operate, enroll, and confine children, including Plaintiff beginning in 2001, notwithstanding that order, without disclosing it to Plaintiff's mother. In 2008, after

Plaintiff's enrollment, the practices of FFS were the subject of oversight hearings before the United States House of Representatives Committee on Education and Labor, to which the institution publicly responded, through Defendant Brain, by characterizing its sanction practices as benign and marketing itself as a reformed and rigorous program, while the former students it had abused, including Plaintiff, and their families remained deceived as to what had been done to them. In 2010, following complaints by former students, the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities, the Office of Mental Health, the Office of Alcoholism and Substance Abuse Services, and the State Education Department jointly investigated FFS, including a site visit in June 2010 and written correspondence with FFS in September and October 2010, and on December 29, 2010 the four agencies wrote jointly to Defendant Emmanuel Argiros, as President of FFS, stating their finding that the accounts of former students spanning approximately 2000 through 2010, a period encompassing Plaintiff's enrollment, concerning abusive practices at the institution were credible and strikingly similar to one another, and noting a 2008 visit by an accrediting body after which practices the agencies described as formerly punitive had rapidly changed. Defendants continued to operate, enroll, and confine children for four more years. Those findings concerned the treatment of children; they did not disclose, and no state agency has ever disclosed, the financial structure of the enterprise, who profited from it, or the participation of the institutional Defendants named herein.

69. Throughout and after Plaintiff's enrollment, FFS staff limited, monitored, and censored students' contact with their families, preventing full disclosure of the true conditions of confinement. On information and belief, and as later confirmed by testimony in the 2025 federal criminal trial of Paul Geer, the Argiros family, and Defendant Emmanuel Argiros as the custodian of the institution's records, deliberately destroyed student records, abuse complaints, and other

institutional documentation, directly depriving Plaintiff and other former students of the evidentiary record necessary to discover and assert their claims.

**K. Discovery of the Enterprise**

70. Plaintiff always knew that she had been mistreated at FFS. What she did not know, and could not have known, was what her mistreatment was part of: that the institution was an enterprise that would operate for eleven years after she left on the same methods; that the staff member the institution kept in charge of its trips was transporting children on those trips for sexual purposes, including on a trip to Toronto during her own enrollment; that the institution was billing families for the overnight isolation of their children; that the institution's records would be destroyed; and that the tuition her mother paid was part of the revenue of an operation that profited from children for a quarter century and that its bank financed against the product of the children's labor. Plaintiff did not discover any of that until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial. It was the evidence and testimony adduced at that public trial that first revealed to her the enterprise's decades-long pattern of institutional concealment, the destruction of records, the institution's practice of billing families for the isolation of their children, the admission of its president that it employed no clinical professionals, and the coordinated participation of the individual and institutional Defendants named herein, and that gave rise to the filing of this action. A child in the enterprise's custody, taught that she was the one in the wrong, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the eleven years before Plaintiff's enrollment, during the congressional hearings and State investigation that followed it, or in the eleven years of the enterprise's operation after she left.

**L. Injuries and Damages**

71. As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered severe and lasting injury, including but not limited to: the strip search inflicted upon her at intake and the physical injury it caused, and, on information and belief, the photographing of her; the denial of any counseling or treatment for the difficulties for which she was enrolled; the anaphylactic reaction she suffered after a staff member dismissed her report of symptoms as a lie; the degradation of the raw-meat and poverty sanctions and of the sanction regime generally; the months of enforced separation from her mother; the labor extracted from her over twenty-nine months; the loss of the education her mother paid for and her inability to sustain a college education since; post-traumatic stress disorder, generalized anxiety disorder, panic attacks severe enough that she loses consciousness, and visual flashbacks of herself at fifteen being screamed at by Michael Losicco at the table, for which she has been prescribed medication and for which she undertook outpatient trauma-focused psychotherapy from May 2024 through March 2025, until the cost of that treatment forced her to discontinue it, her treating clinician having identified her experiences at FFS as the primary cause of her post-traumatic symptoms; a substance use disorder for which she has been unable to seek specialized treatment because such programs are modeled on the twelve-step regime FFS imposed on her; the loss of the tuition paid on her behalf; the value of twenty-nine months of uncompensated labor; a persistent belief, instilled at FFS, that she is never good enough and will be found at fault, which has followed her into every workplace; and continuing emotional and psychological injury, pain and suffering, humiliation, and loss of enjoyment of life. Plaintiff's psychiatric injury was further aggravated by the April 2024 federal indictment of Paul Geer, by the February 2025 public trial, and by the disclosures made there concerning the institution that had held her; she entered trauma treatment the month after that indictment.

## TOLLING OF STATUTES OF LIMITATIONS

72. Plaintiff's claims arising from conduct constituting a sexual offense, the use of a child in a sexual performance, or abuse or degrading treatment committed against her while a minor, including the strip search and, on information and belief, the photographing of Plaintiff described herein, the raw-meat and poverty sanctions, and her claims for battery, false imprisonment, and intentional infliction of emotional distress described herein, are timely pursuant to CPLR 208(b), which extends the infancy toll applicable to such claims until the victim's fifty-fifth birthday.[1] Plaintiff was born in May 1985, and is presently forty-one years of age; her claims are accordingly timely on this independent ground alone, without regard to any other tolling doctrine set forth below.

73. Plaintiff's RICO claims are timely. Plaintiff did not discover the true nature of the racketeering enterprise until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial, and the limitations period began to run, at the earliest, upon that discovery; it was the evidence and testimony adduced at that public trial that first revealed the coordinated, institutional, and enterprise character of the conduct. Plaintiff, a child in the enterprise's custody from fifteen to eighteen years of age and thereafter an adult it held under the same regime, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the eleven years before Plaintiff's enrollment or the eleven years of the enterprise's operation after it. Independently, all applicable limitations periods are tolled by Defendants' fraudulent

[1] Plaintiff asserts no claim under CPLR 214-g. The revival window established by the Child Victims Act closed before this action was commenced. Should the Legislature reopen or extend that revival window, or enact comparable revival legislation, Plaintiff reserves the right to seek leave to amend this Complaint to assert all claims thereby revived.

concealment, the self-concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth below.

74. Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, and 1595 arising from her enrollment, the whole of which post-dated the effective date of those provisions, and from the continuing receipt of the benefits of that enrollment and of the venture's operation alleged herein, are timely under 18 U.S.C. § 1595(c), together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy grounds set forth herein. Plaintiff's claims under 18 U.S.C. § 1595 for the obstruction of enforcement alleged herein arise from continuing violations, each of which has continued through the 2024 federal indictment and March 3, 2025 conviction of Paul Geer and through the filing of this action, and each month of which constitutes a fresh act within the limitations period. Plaintiff's claims under 18 U.S.C. § 2255 are subject to no limitations period, the Eliminating Limits to Justice for Child Sex Abuse Victims Act having eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual, were not time-barred as of that date.

75. Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a) Fraudulent Concealment. Defendants engaged in a coordinated scheme of affirmative concealment including: (i) FFS staff limited, monitored, and censored students' contact with their families, including through the reading and censorship of outgoing and incoming mail and the limitation of telephone contact described in FFS's own Handbook and imposed on Plaintiff and her mother as described herein; (ii) Defendants continued to operate FFS notwithstanding the 1990 cease and desist order, without disclosing that order to Plaintiff's mother; (iii) FFS represented to Plaintiff's mother that Plaintiff was receiving

counseling and treatment, when she was receiving the raw meat, the poverty sanction, blackout, and the pig pens, sent Plaintiff's mother letters over Plaintiff's name that Plaintiff had not written, and taught Plaintiff herself that she was the one in the wrong; (iv) FFS billed families for the overnight isolation of their children under a description that did not disclose what the charge was for; (v) the institution, through Defendant Brain, publicly minimized and mischaracterized its practices in its May 2008 response to congressional oversight hearings, and, through Defendant Emmanuel Argiros, responded to the 2010 state investigation while continuing to operate as before; (vi) on information and belief, the Argiros family deliberately destroyed student records, abuse complaints, and institutional documentation, as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary record necessary to discover and assert her claims; and (vii) on information and belief, the institution retained and never disclosed the intake photographs it took of Plaintiff and other students. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period. Plaintiff's knowledge that she herself had been mistreated is not knowledge of the facts on which these claims rest: that the institution was an enterprise, that its trips were the occasions of its trip leader's crimes, that it billed families for isolating their children, that its records were destroyed, and that its bank financed it against the product of the children's labor. Those facts were concealed from her, and from everyone outside the enterprise, until 2025.

(b) Self-Concealing Conspiracy. The enterprise was structured to prevent victims from connecting their individual experiences to the broader enterprise. Its mechanisms of isolation, including the censorship of family contact described herein, the instillation in

students of the belief that they themselves were in the wrong, which Plaintiff carried for years after her release, and the use of staff and local law enforcement to return students who fled, were themselves instruments of concealment rendering victims, including Plaintiff, structurally incapable of discovering the enterprise during enrollment or for years thereafter.

(c) Overt Acts Within the Limitations Period. The destruction of student records by the Argiros family, as established by testimony at Geer's 2025 criminal trial, constitutes an overt act in furtherance of the conspiracy committed within the limitations period. The below-market transfer of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC in November 2014, the further transfer of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC in June 2016, and the 2014 incorporation of K9-5 Inc. immediately upon FFS's closure, each constitute further independent overt acts of asset disposition and concealment in furtherance of the conspiracy falling entirely within the limitations period. The continued concealment on the former campus property of the institutional records that survived the destruction, described herein, constitutes a further overt act of concealment in furtherance of the conspiracy continuing within the limitations period.

76. Plaintiff's claim under N.Y. Social Services Law § 483-bb is timely on the grounds set forth in Count V below, including CPLR 212(e).

77. Common-law fraud and negligent misrepresentation. Plaintiff's claims are timely under CPLR 213(8), which permits an action to be commenced within the greater of six years from the fraud or two years from discovery. The two-year discovery period runs from the discovery described above, and this action is timely under both measures.

78. All applicable statutes of limitations on Plaintiff's negligence, negligence per se, and 42 U.S.C. § 1983 claims are independently tolled by the fraudulent concealment and equitable estoppel doctrines set forth above, in addition to CPLR 208(b) as set forth above.

79. Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

## COUNT I: CIVIL RICO (18 U.S.C. § 1962(c))

### (Against All Defendants)

80. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

81. At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution as its vehicle but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act, and operated as a continuing unit for decades, including throughout Plaintiff's 2001-2003 enrollment.

82. Each Defendant knowingly participated in the conduct of the enterprise's affairs. FFS and Defendant Betty Argiros owned, operated, and directed the enterprise, made the decisions regarding staffing, student control, and continued operation notwithstanding the 1990 cease and desist order, and financially benefited from every aspect of the enterprise's operation. Defendant Emmanuel Argiros, as president of the FFS board throughout Plaintiff's enrollment and, on information and belief, the custodian of its records, and, on information and belief, Defendant Cindy Argiros, as a family leader, directed the institution's operation and the forced-labor and

sanction practices described herein and participated in the conduct of the enterprise's affairs at the institutional level. Through its family-unit staff, including the leaders of Family Two, and the staff members and senior students they deputized as sponsors, Education Plus Corporation administered the labor, sanction, and blackout regime imposed upon Plaintiff, conducted the intake strip search described herein, transported Plaintiff out of the State to labor for a third party, billed families for the overnight isolation of their children under a description that concealed what the charge was for, and pursued and returned to its custody the children who fled it, including Plaintiff. Defendants NBT Bank, N.A. and NBT Bancorp Inc. knowingly and purposefully participated in the conduct of the enterprise's affairs, not as a passive depository but as the enterprise's secured lender. The bank extended secured credit to the enterprise and its property-holding entity, including the security interests taken from both the operating corporation and its title-holding entity on November 19, 2008, months after the congressional hearings, and took as its collateral the fruit of the children's forced labor: the tuition receivables and enrollment contracts, including Plaintiff's, the inventory and livestock the children unloaded and tended, the equipment and improvements they built and maintained, and, from March 24, 2010, the campus itself, whose upkeep was the children's daily labor. Having taken that collateral, the bank held a direct financial stake in the continuation of the operation and in the continued confinement of the children in it, because without enrolled children there was no tuition to repay it and without children to house and to labor there was no operating campus to secure it; and the bank acted on that stake, continuing and renewing its credit in 2002, 2004, 2006, 2008, 2010, 2011, 2013, and, by continuation nearly two years after the school closed, 2016, holding its lien on the enterprise's collateral every day through December 18, 2021, inspecting and appraising, on information and belief, the very campus on which the children's labor was open and visible, processing every tuition deposit, payroll check, and disbursement of

the enterprise through its Village of Hancock branch, including tuition paid on Plaintiff's behalf, financing the 2014 conveyance by which the enterprise's principal asset was moved beyond the reach of its victims and collecting its own payoff from it, and taking the transferee as a new lending customer, all while disregarding the public record of FFS's unlicensed operation and the knowledge that its own underwriting, collateral inspections, and ledgers supplied, and while taking no corrective action of any kind following the 2024 indictment and 2025 conviction of Paul Geer. That course of conduct was a choice, repeated at each renewal and each notice event, to keep the operation running because the bank's collateral and its repayment depended on it. Defendant Sysco, on information and belief, advanced and benefited from the enterprise by serving as its recurring institutional food distributor while its own personnel observed minor children, including, on information and belief, Plaintiff, unloading its trucks. Defendant NATSAP lent membership legitimacy to FFS's fraudulent marketing representations. The Hancock Herald contributed to the enterprise's fraudulent marketing of FFS to the public. Defendant Jeffrey Brain participated in the conduct of the enterprise's affairs by directing the enterprise's admissions, its external relations, and its public representations, including the May 2008 public response to congressional oversight described herein, continuing the enterprise's fraudulent marketing and maintaining the concealment on which its continued operation depended, and by drawing his compensation for years from the proceeds of that operation. The Village of Hancock, Town of Hancock, County of Delaware, Delaware County Sheriff's Office, and Delaware County Board of Supervisors, upon information and belief, participated in and enabled the enterprise's continued operation and concealment by permitting FFS to operate without proper licensure notwithstanding the 1990 cease and desist order and by locating children who fled FFS and returning them to its custody without inquiry, and, pleaded in the alternative, benefited economically from the enterprise's continued

operation, which brought into their communities the payroll of local residents employed by the institution, the patronage of visiting families, and the institution's recurring, tuition-funded purchasing from local suppliers. Defendants Emmanuel Argiros and Cindy Argiros continued the enterprise's pattern of concealment following FFS's 2014 closure through the below-market transfers of the FFS real property and the incorporation of Defendant K9-5 Inc. described in the Tolling section supra, transactions that dissipated the enterprise's assets and furthered its concealment from former students, including Plaintiff, with reasonably foreseeable claims arising from the conduct alleged herein. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, conducted its search dog operation in common with the enterprise's canine program, the Dog Corps, through their shared principal, Rita Argiros, the enterprise's Executive Program Director, and received the benefit of the children's unpaid labor within that operation and of the labor of the student body, including Plaintiff, that ran the institution housing it. The Highlights Defendants, upon information and belief, maintained through their own longtime employee and author, Cheripko, a continuous relationship with the enterprise, sold their publications into its purported educational program, received the benefit of the children's labor at their Wayne County retreat, and lent the enterprise the legitimacy of an established educational publisher. Defendant Chapel Hill Land Holdings LLC participated in and benefited from the enterprise's concealment by acquiring the FFS real property with notice of the claims against the transferors and, on information and belief, by retaining undisclosed on that property, for approximately a decade, the institutional records that survived the destruction described herein.

83. Paul Geer, who is not named as a defendant, participated in the conduct of the enterprise's affairs as the director of its choir and the custodian of children on its trips off the campus throughout Plaintiff's enrollment, while the enterprise, with knowledge of his confessed sexual

misconduct with students, retained him for the value his choir brought to it and drew his compensation for years from the enterprise's account at NBT Bank; his conduct is alleged as conduct of the enterprise and of Education Plus Corporation.

**Pattern of Racketeering Activity.**

84. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over the course of Plaintiff's enrollment and the enterprise's decades-long operation:

(a) Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343: Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment and marketing materials and to collect tuition payments, including the tuition paid on Plaintiff's behalf by her mother from North Carolina, in furtherance of the scheme to defraud families regarding the true nature of FFS;

(b) Money Laundering, 18 U.S.C. § 1956: Defendants processed and concealed the fraudulently obtained proceeds of the enterprise through accounts maintained at NBT Bank;

(c) Forced Labor, 18 U.S.C. § 1589: Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros obtained Plaintiff's labor and services through physical restraint, the abuse of the custody they held over her, and the scheme, plan, and pattern intended to cause Plaintiff to believe that failure to perform such labor would result in serious harm to her, including blackout, the extension of her confinement, humiliation before her peers, and separation from her mother;

(d) Trafficking with Respect to Forced Labor, 18 U.S.C. § 1590: Defendants recruited, transported, including on the trips out of the State described herein, harbored, and obtained Plaintiff and other minors across state lines for the labor and services described herein;

(e) Transportation of Minors, 18 U.S.C. § 2423: Defendants transported minors in FFS's custody, including Plaintiff, in interstate commerce, including to Pennsylvania, with the intent that they engage in sexual activity for which a person can be charged with a criminal offense, as established as to FFS staff member Paul Geer by his 2025 federal conviction for transporting FFS students to Maine in 1994 and to Toronto in 2001, conduct of which the institutional Defendants had knowledge and which they permitted to continue throughout Plaintiff's enrollment; and

(f) Sexual Exploitation of Children, 18 U.S.C. §§ 2251 and 2252: on information and belief, Defendants used minors in FFS's custody, including Plaintiff, in the production of visual depictions of unclothed children in the course of the institution's intake photography practice, using materials that had traveled in interstate commerce, and knowingly retained those depictions.

**Continuity.**

85. The pattern of racketeering activity spanned multiple decades, encompassed numerous victims across the related actions described herein, and employed the same methods consistently over time, satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

86. Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

87. Plaintiff was injured in her business and property by reason of Defendants' racketeering activity. Defendants obtained substantial tuition and charges, approximately $92,800 in tuition over twenty-nine months, together with approximately $7,200 in travel costs the enrollment required, including the cost of a visit for which Plaintiff's mother flew to New York and which the institution cancelled on her arrival, paid by Plaintiff's mother for counseling, treatment, and schooling they never provided; that tuition was a total economic loss, money paid for which nothing was delivered. Defendants further extracted from Plaintiff twenty-nine months of uncompensated institutional labor, including construction and landscaping labor performed for a third party at a retreat house in Pennsylvania, whose value they retained. These are concrete financial injuries to Plaintiff's business and property, independent of any psychological injury and directly traceable to Defendants' racketeering, and include the impairment of Plaintiff's earning capacity reflected in her inability to complete a single semester of college, never having been taught the skills a genuine education would have given her, and in the years of effort required for her to build her own art business without one. Plaintiff is entitled to recover threefold her damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Statute of Limitations.**

88. All applicable limitations periods are tolled as set forth in the Tolling section supra.

89. Defendant NBT Bancorp is liable under this Count for its own conduct and as principal for the conduct of NBT Bank undertaken as its agent. Its own conduct consists of the policies it set and oversaw, the credit extended and secured under those policies, the benefits it knowingly received and reported as its own, and the knowledge of the executives through whom it acted.

## COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d))

**(Against All Defendants)**

90. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise described in Count I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and knowingly agreed to participate in, facilitate, and further it. Under Salinas v. United States, 522 U.S. 52 (1997), a defendant may be liable for RICO conspiracy upon proof that it agreed to the overall objective of the conspiracy, that the enterprise's affairs be conducted through a pattern of racketeering activity, whether or not that defendant agreed to commit, or itself committed, any two or more predicate acts.

92. Each Defendant's agreement is evidenced by its own knowing, sustained participation in the scheme, as alleged in the Enterprise allegations of Count I above and incorporated here: Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros agreed to and did direct and administer the institution's continued unlicensed operation, enrollment, and confinement of children, including Plaintiff, notwithstanding the 1990 cease and desist order, and the forced-labor, isolation, food-deprivation, and sanction practices through which the enterprise's affairs were conducted; Defendants NBT Bank, N.A. and NBT Bancorp Inc. agreed to and did continue, for decades and through 2026, to maintain the enterprise's accounts, to extend and renew secured credit against collateral that was the fruit of the children's forced labor, to hold thereby a financial interest in the operation's continuation and in the continued confinement of the children whose labor secured and repaid that credit, to finance the 2014 disposition of the enterprise's principal

asset, and to refrain from filing any Suspicious Activity Report or making any disclosure to a regulator or law enforcement agency, despite escalating notice culminating in the 2024 indictment and 2025 conviction of Paul Geer, an agreement evidenced by the renewal of that credit at each of 2002, 2004, 2006, 2008, 2010, 2011, 2013, 2015, and 2016, and by the lien it chose to hold through December 18, 2021; Defendant Sysco agreed to and did continue its recurring, tuition-funded supply relationship with the enterprise while its own drivers observed the child labor from which it benefited; Defendant Eagle Valley agreed to and did, through its own founder and president, conduct its canine operation in common with the enterprise and take the benefit of the children's unpaid labor; the Highlights Defendants agreed to and did maintain their relationship with the enterprise through their embedded author while selling their publications into it and taking the benefit of the children's labor at their retreat; Defendant NATSAP agreed to and did continue collecting membership dues from the enterprise while lending it the accreditation on which placing families relied; Defendant The Hancock Herald agreed to and did continue publishing content promoting the enterprise's legitimacy while omitting matters of public concern regarding its operation; Defendant Jeffrey Brain agreed to and did continue directing the enterprise's admissions and public relations, including authoring or approving the May 2008 congressional response described herein, while drawing his compensation from the enterprise's proceeds; and Defendants Emmanuel Argiros and Cindy Argiros agreed to and did, following the 2014 closure, direct the disposition of the enterprise's remaining assets through Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that

enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it.

93. Overt acts committed in furtherance of the conspiracy, within the applicable limitations period, include: the deliberate destruction of student records, abuse complaints, and other institutional documentation by the Argiros family, as confirmed by testimony at Paul Geer's 2025 federal criminal trial; the November 2014 below-market conveyance of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC; the June 2016 conveyance of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC; the 2014 incorporation of Defendant K9-5 Inc. immediately upon FFS's closure; Chapel Hill Land Holdings LLC's continued concealment, for approximately a decade following the 2014 closure, of surviving institutional records on the former campus property, until their recovery by federal law enforcement pursuant to a search warrant; and NBT Bank's continued maintenance of, and failure to report or disclose, the enterprise's account relationships following the 2024 indictment and March 3, 2025 conviction of Paul Geer, a course of silence continuing through 2026 and through the filing of this action. Each of these acts was committed within the limitations period and independently satisfies the overt-act requirement of the conspiracy alleged in this Count.

94. Plaintiff was injured in her business and property by reason of the predicate acts of racketeering, and the overt acts, committed in furtherance of the conspiracy alleged in this Count, in the same respects set forth in Count I above, and is entitled to recover threefold the damages she sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). All applicable limitations periods are tolled as set forth in the Tolling section supra.

95. Defendant NBT Bancorp is liable under this Count for its own conduct and as principal for the conduct of NBT Bank undertaken as its agent. Its own conduct consists of the policies it set and oversaw, the credit extended and secured under those policies, the benefits it knowingly received and reported as its own, and the knowledge of the executives through whom it acted.

## COUNT III: FORCED LABOR, 18 U.S.C. §§ 1589 AND 1595

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

96. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

97. From February 12, 2001 through June 28, 2003, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, acting through the staff members and senior students described herein, including the leaders of Family Two and the staff member assigned as Plaintiff's sponsor, knowingly obtained Plaintiff's labor and services, including her labor cleaning and tending the institution's pig pens, shoveling its snow, working its gardens and grounds, carrying the duties of a dormitory leader imposed on her as a sanction, cleaning the property and carrying cinder blocks on work sanction, sitting hours-long watches over the children it held in isolation, and performing landscaping and construction work at the retreat house in Pennsylvania to which it transported her, by means of force and physical restraint, including her confinement to a campus she could not leave and her pursuit and return when she fled; by means of serious harm and threats of serious harm, including blackout, the loss of all contact with her mother, public degradation, the corner without shoes, and the extension of her confinement and labor as punishment; by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor, she would suffer serious harm, including those sanctions and her

interception and return if she fled; and by means of the abuse of the position of legal custody and control Defendants held over Plaintiff, a minor until May 28, 2003.

98. As a direct and proximate result of this forced labor, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## COUNT IV: NBT BANK OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

99. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100. At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for the Argiros Defendants individually, through which the financial proceeds of the enterprise were deposited, transferred, and disbursed.

101. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the sexual exploitation of the children in FFS's custody, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. § 1591. NBT Bank obstructed, attempted to obstruct, and interfered with that enforcement by

maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, including the December 2, 2002 filing made during Plaintiff's enrollment, against collateral her labor was building and maintaining, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the underwriting, collateral inspection, and financial review that its March 24, 2010 loan against the campus required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students, notice renewed and confirmed upon his conviction on March 3, 2025 after a public two-week trial. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is

independent of, and does not await, any request from law enforcement, and arose anew at each stage. At each stage, NBT Bank's obligations of customer due diligence and suspicious-activity reporting required inquiry; at each stage, the bank chose the continued receipt of fees, interest, and deposits over compliance. On information and belief, the bank's own payroll ledger for the enterprise records every paycheck issued to Paul Geer through 2014, the entire period during which FFS retained him after learning of his confessed sexual misconduct with students; after his indictment and conviction publicly established what those payments had bought, the bank did not review, freeze, report, or otherwise act upon the accounts through which he had been paid or the accounts of the principals who had kept him. On information and belief, the bank also took no step, after the indictment or the conviction, to freeze or review the accounts of Chapel Hill Land Holdings LLC, whose purchase of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call, terminate, or withdraw the credit it had extended against that property.

102. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

103. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and

assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

104. Defendant NBT Bancorp is liable under this Count for its own conduct and as principal for the conduct of NBT Bank undertaken as its agent. Its own conduct consists of the policies it set and oversaw, the credit extended and secured under those policies, the benefits it knowingly received and reported as its own, and the knowledge of the executives through whom it acted.

## COUNT V: NY SOC. SERV. LAW § 483-bb (CHILD VICTIMS OF LABOR TRAFFICKING)

**(Against All Defendants)**

105. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

106. N.Y. Social Services Law § 483-bb(c) provides a civil cause of action to an individual who is a victim of conduct prohibited by N.Y. Penal Law §§ 135.35 (labor trafficking) and 135.37 (aggravated labor trafficking), and permits recovery not only against the perpetrator of such conduct but also against whoever knowingly advances or profits from, or should have known he or she was advancing or profiting from, an act in violation of those provisions.

107. While a minor in Defendants' custody, and thereafter as an adult it held under the same regime, Plaintiff was the victim of labor trafficking: she was recruited through the referral network described herein, delivered to and harbored at FFS on the misrepresentations described herein, and she was compelled to provide labor and services, including the livestock, snow, garden, grounds, cinder-block, isolation-watch, dormitory, and retreat-house labor described herein, by means of

physical restraint, confinement, blackout, public degradation, the monitoring and censorship of her family contact, and the institutional sanction regime described herein, from February 12, 2001 through June 28, 2003.

108. Each Defendant engaged in, advanced, or profited from, or should have known it was advancing or profiting from, that labor trafficking, in the same respects and for the same reasons set forth as to each Defendant in the Enterprise allegations of Count I. NBT Bank, N.A. and NBT Bancorp Inc. profited from the account relationships through which the proceeds of the operation, including tuition paid on Plaintiff's behalf, were deposited, processed, and disbursed, and from the secured credit whose collateral was, in substantial part, the product of the children's labor, including the gardens and grounds Plaintiff kept, the snow she cleared, the pigs she tended, the isolation room she guarded, and, on information and belief, the food inventory she unloaded from Sysco's trucks; Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. held, received, and continue to hold and benefit from property and assets of the operation, including property improved and maintained by student labor and, as to Chapel Hill Land Holdings LLC, the continuing commercial use, season after season through the present, of the campus buildings and grounds the children built and maintained; Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, profited from the unpaid labor of the enterprise's children in the canine operation conducted in common with it by its own founder and president, and from the labor of the student body, including Plaintiff, that ran the institution housing that operation; the Highlights Defendants, upon information and belief, advanced the trafficking through their continuous relationship with the enterprise's embedded staff and profited from the enterprise's purchases of their publications and from the labor of its children at their retreat; NATSAP received membership dues from FFS while lending it the institutional legitimacy

on which enrolling families relied; Sysco profited from, and should have known it was profiting from, that labor trafficking, its own personnel having observed Plaintiff and other children unloading its trucks; Jeffrey Brain profited from and advanced that labor trafficking, drawing his compensation from an operation whose revenues, facilities, and going-concern value were the product of the labor of its students, including Plaintiff, and advancing, through the public concealment described herein, the operation's continuation; and the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors advanced that trafficking by permitting the institution's continued, unlicensed operation within their jurisdictions notwithstanding the official notice described herein and by locating and returning to the institution students who fled it, and, pleaded in the alternative, profited from that continued operation as alleged in Count I.

109. Social Services Law § 483-bb(c)(ii) provides that an action under that subdivision shall be commenced within fifteen years of the date on which the trafficking victim was freed from the trafficking situation or, if the victim was a minor when the act of human trafficking occurred, within fifteen years after the date the victim attains the age of majority, and CPLR 212(e) provides that the period does not begin to run, and is tolled, during any period in which the victim is or remains subject to such conduct, as Plaintiff remained through June 28, 2003. The running of that period is further tolled and suspended under § 483-bb(c)(iii) and (iii)(A) by Plaintiff's minority until May 28, 2003 and by the incapacity described herein; under § 483-bb(c)(iv) by her inability, due to circumstances resulting from the trafficking situation and the concealment described herein, reasonably to discover her cause of action; and under § 483-bb(c)(iii)(C) by Defendants' conduct inducing delay in the filing of this action and causing duress upon her, as described herein, which estops them from asserting the limitations defense; and under § 483-bb(c)(iii)(D) each such

suspension applies to all other related claims arising out of the trafficking situation alleged herein. Plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally.

## COUNT VI: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

110. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

111. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

112. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her intake, the search of her by the staff member assigned as her sponsor and the intake photograph, the sanctions imposed upon her, the rosters of the children transported on the institution's trips, and the complaints and reports of students concerning the sexual conduct of staff. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, after FFS had been sued civilly and while Defendant Argiros was concerned about his own civil exposure, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by destroying the evidentiary record of the sex trafficking of FFS students for which Paul Geer was later prosecuted.

113. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

114. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT VII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

115. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

116. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

117. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, the Argiros family deliberately destroyed

student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her labor assignments, the sanctions imposed upon her, her academic record, the institution's billing of families for the overnight isolation of their children, and the payments made on her behalf by her mother. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by destroying the evidentiary record of the operation's forced-labor practices, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals.

118. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

119. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT VIII: OBSTRUCTION OF LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

120. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

121. 18 U.S.C. § 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of that section. 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

122. As alleged herein, the operation of FFS recruited, transported, harbored, and obtained minor children, including Plaintiff, for labor and services, and NBT Bank maintained the accounts through which the financial proceeds of that operation were deposited, transferred, and disbursed. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the forced labor of the children in FFS's custody, which the government itself described in charging that staff member, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. §§ 1589 and 1590. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by maintaining that account relationship and continuing to process the operation's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record

beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, including the December 2, 2002 filing made during Plaintiff's enrollment, against collateral her labor was building and maintaining, whose collateral was the operation's inventory, livestock, accounts, and enrollment contracts, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the March 24, 2010 loan against the campus that the children's labor had improved and maintained, together with the underwriting, collateral inspection, and financial review that credit required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer, notice renewed and confirmed upon his conviction on March 3, 2025. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is independent of, and does not await, any request from law enforcement, and arose anew at each stage. No enforcement action under 18 U.S.C. § 1590 has ever

been brought against the operation or its principals; the concealment the bank's conduct sustained prevented that enforcement.

123. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

124. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims arising from the forced-labor operation described herein and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

125. Defendant NBT Bancorp is liable under this Count for its own conduct and as principal for the conduct of NBT Bank undertaken as its agent. Its own conduct consists of the policies it set and oversaw, the credit extended and secured under those policies, the benefits it knowingly received and reported as its own, and the knowledge of the executives through whom it acted.

## <u>COUNT IX: NEGLIGENT FAILURE TO PROVIDE PROMISED THERAPEUTIC SERVICES, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, N.Y. GEN. BUS. LAW § 349</u>

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

126. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d).

127. Defendants owed Plaintiff a distinct duty of reasonable care arising from their express representations that FFS would provide qualified therapeutic treatment, counseling, and a high school education to Plaintiff, a fifteen-year-old sent to them, after a shoplifting incident, for counseling, structure, and an education. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services, and was compounded by FFS's substitution of forced labor, confinement, isolation, and humiliation for any genuine treatment or education of Plaintiff, and by its presentation of the compliance that fear produced as therapeutic progress, so that the difficulties for which Plaintiff was enrolled were masked rather than addressed during the years in which they could have been.

128. Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, medical, or licensed therapeutic or addiction-treatment professionals; (b) failing to have Plaintiff seen by any clinician at any time during twenty-nine months in their custody; (c) failing to conduct any meaningful evaluation, diagnosis, or treatment planning for Plaintiff; (d) substituting forced labor, confinement, isolation, and humiliation for genuine treatment; (e) subjecting Plaintiff to an intake strip search, without medical screening, parental

consent, or lawful authority, and without any inquiry into her medical history, so that the search dislodged an item surgically placed within her body and injured her, and, on information and belief, photographing her; (f) making a fifteen-year-old girl sit with raw meat on her lap and telling her that she treated her body like a piece of meat, and requiring her to read a written account of her sexual history aloud to her mother and three staff members; (g) imposing contradictory dress sanctions that no conduct could satisfy, culminating in the poverty sanction described herein; (h) cutting a fifteen-year-old off from her mother for months and thereafter censoring every letter and monitoring every call between them; (i) transporting Plaintiff out of the State to perform construction and landscaping labor for a third party; (j) returning Plaintiff to confinement after each of her flights without any inquiry into why she had fled; (k) billing families for the overnight isolation of their children under a description that concealed what the charge was for; (l) enforcing a rule that children finish everything on their plates, forcing a vegetarian child to eat meat while she was ill for weeks, and, when Plaintiff reported the symptoms of an allergic reaction, telling her she was lying and to finish her meal, so that she went into anaphylactic shock, and thereafter summoning no physician or paramedic and conducting no follow-up; (m) assigning children to guard other children confined in an isolation room; (n) graduating Plaintiff without ever having taught her how to study or to sustain academic work, so that she has been unable to complete a college education; and (o) continuing to enroll and confine students, including Plaintiff, notwithstanding the 1990 cease and desist order. Defendants' representations that FFS was a qualified therapeutic institution and a school constitute deceptive acts and practices within the meaning of N.Y. General Business Law § 349, directed at consumers generally through FFS's marketing materials and the consultants who referred children to it, and causing Plaintiff's mother the actual injury of tuition and charges paid for services never rendered.

129. As a direct and proximate result of Defendants' negligent, fraudulent, and deceptive conduct, independently of any other theory of liability in this Complaint, Plaintiff suffered the injuries described herein and is entitled to compensatory damages and punitive damages. This claim is timely pursuant to CPLR 213(8) and N.Y. General Business Law § 349(c), as set forth in the Tolling section supra.

## COUNT X: NEGLIGENCE AND NEGLIGENT SUPERVISION, HIRING, AND RETENTION

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

130. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding and following counts, Defendants owed Plaintiff and other enrolled minor students a non-delegable duty of reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff and by the institution's own custodial and disciplinary practices.

131. Defendants breached that duty by, among other things: continuing to operate and enroll students, including Plaintiff, notwithstanding the 1990 cease and desist order; directing, permitting, and conducting an intake strip search of Plaintiff by the staff member assigned as her sponsor, without medical screening, parental consent, lawful authority, or any inquiry into her medical history, in the course of which she was physically injured, and, on information and belief, photographing her; imposing sustained forced labor on Plaintiff, including the livestock, snow, garden, grounds, dormitory, and retreat-house labor described herein; permitting staff and senior students to impose the raw-meat sanction, the contradictory dress sanctions, the poverty sanction,

the corner without shoes, and the compelled reading of Plaintiff's sexual history to her mother described herein; placing Plaintiff in the custody of family leaders with no clinical qualification, one of whom, Michael Losicco, conducted the family's "therapy" sessions and recounted to the children in explicit detail his own heroin use; permitting a staff member to dismiss Plaintiff's report of an allergic reaction as a lie, so that she went into anaphylactic shock, and summoning no physician afterward; providing no psychological, psychiatric, medical, or addiction treatment of any kind to a child enrolled for counseling; retaining on staff, throughout Plaintiff's enrollment, a staff member, Paul Geer, whom the administration knew, from his own confession to its staff and, on information and belief, from a student's report to Emmanuel Argiros in or about 2001 of a sexual assault on a chorus trip to Toronto, had engaged in sexual misconduct with students, and who has since been convicted of transporting FFS students for the purpose of sexual activity, after refusing a staff member's demand that he be fired, and keeping him in charge of its trips while Plaintiff was in its custody; and returning Plaintiff to confinement after each of her flights without inquiry. This conduct created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained.

132. As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XI: ASSAULT, BATTERY, FALSE IMPRISONMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

133. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

134. The intake strip search to which Plaintiff was subjected, in the course of which an item surgically placed within her body was dislodged, and, on information and belief, the photographing of her, constituted a battery upon her, then a fifteen-year-old minor, without consent or lawful justification, and caused her physical injury. The search was conducted by Jackie Petriella, the staff member assigned to Plaintiff as her sponsor, pursuant to the uniform intake policy adopted, directed, and enforced by Defendants Education Plus Corporation and Betty Argiros, and these Defendants are directly liable, together with the staff who carried it out, for the battery committed in execution of that policy. The sanction that required Plaintiff to sit with raw meat placed on her lap was a further offensive contact imposed on her without consent. The staff who confined Plaintiff to the campus and to the institution's custody against her will throughout her enrollment, who pursued and returned her when she fled, and who controlled her contact with her mother, committed false imprisonment upon Plaintiff. Each such act was performed in execution of the intake, sanction, and confinement policies adopted, directed, and enforced by the Defendants named in this Count and within the scope of the duties they assigned, and these Defendants are directly and vicariously liable for them.

135. Independently, the course of conduct described herein, including the intake strip search of a fifteen-year-old girl that dislodged a surgically placed item from her body and, on information and belief, the photographing of her, the raw-meat sanction and the words that accompanied it, the contradictory dress sanctions and the poverty sanction, the compelled reading of her sexual history to her mother before three staff members, the weeks in the corner without shoes for grieving her grandfather, the staff member's dismissal of her allergic reaction as a lie, the months of enforced separation from her mother and the censorship of every contact between them, the letters sent to her mother over her name that she had not written, the labor extracted from her on and off the campus,

and her pursuit and return to confinement, without inquiry, each time she fled, was extreme and outrageous, was undertaken intentionally or with reckless disregard of the substantial certainty that it would cause severe emotional distress, and did cause Plaintiff severe and ongoing emotional distress, for which she remains under psychiatric care.

136. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XII: COMMON-LAW FRAUD AND FRAUDULENT CONCEALMENT (CPLR 213(8))

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

137. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

138. Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain, directly, through FFS staff, and through the consultant who placed Plaintiff, knowingly made material misrepresentations of fact to Plaintiff's mother, including that FFS was a qualified therapeutic boarding school staffed by psychologists, licensed therapists, and teachers to provide counseling, treatment, a high school education, and a safe, supervised residential environment, that Plaintiff would receive qualified treatment, that Plaintiff was attending school and making therapeutic progress, and, to Plaintiff herself, that she was the one in the wrong. Each of these representations was false when made, was known by these Defendants to be false, and was made with the intent that Plaintiff's mother rely upon it. These Defendants also concealed from Plaintiff's mother, while holding her daughter in their custody, that the institution operated under a

public cease and desist order, that it employed no qualified treatment professionals, that no clinician had seen her daughter, that it had injured her daughter in a strip search on the day of her arrival, that the letters it sent her over her daughter's name during blackout were not written by her daughter, that her daughter had gone into anaphylactic shock after a staff member dismissed her symptoms as a lie, that it was making her sit with raw meat on her lap and stripping her of her clothing and makeup as sanctions, that it was transporting her out of the State to perform construction labor for a third party, that it billed families for the overnight isolation of their children under a description that concealed what the charge was for, that its practices were later the subject of congressional oversight hearings whose findings it publicly minimized, and that it retained on staff, in charge of the trips on which it transported children out of the State, a man who had confessed to sexual misconduct with students.

139. Plaintiff's mother reasonably relied on those misrepresentations, paying tuition and charges and surrendering Plaintiff to Defendants' custody for twenty-nine months. Defendants reinforced and concealed the fraud through the devices described herein, including the monitoring and censorship of Plaintiff's family contact, the instillation in Plaintiff of the belief that she was the one in the wrong, the presentation of fear-induced compliance as therapeutic progress, the May 2008 public minimization of the institution's practices, made after Plaintiff had left its custody, which kept her family deceived, and the destruction of institutional records, so that the true conditions of her confinement could not be discovered.

140. Defendants Emmanuel Argiros and Cindy Argiros separately and independently perpetuated that concealment following FFS's 2014 closure. Through the transfers described in the Tolling section supra, and through their purposeful silence following the 2025 public disclosure of the enterprise's conduct at Geer's federal criminal trial, Defendants Emmanuel Argiros and Cindy

Argiros took no step to disclose, correct, or come forward with the truth concerning the conduct to which Plaintiff and other FFS students had been subjected, notwithstanding their knowledge of it, and instead moved the enterprise's remaining assets beyond the reach of the students, including Plaintiff, who had been defrauded and injured. Defendant Jeffrey Brain furthered that concealment through the May 2008 congressional response described herein.

141. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8) and the Tolling allegations set forth supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

## COUNT XIII: COMMON-LAW AIDING AND ABETTING FRAUD

**(Against Jeffrey Brain)**

142. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

143. As set forth in Count XII, Education Plus Corporation and the Argiros Defendants perpetrated a fraud upon Plaintiff and her mother through material misrepresentations concerning the nature of FFS and the services for which they charged, upon which Plaintiff's mother relied to their detriment.

144. Defendant Jeffrey Brain had actual knowledge of that fraud. As Director of Admissions and Vice President for External Relations from approximately 2005 through the institution's 2014 closure, he directed the admissions and external relations apparatus through which the same representations that had been made to Plaintiff's mother and to the consultant who referred her were made to the families who followed; he knew that the institution employed no licensed psychiatrist, psychologist, or clinician; he knew the sanction, labor, and confinement practices in use on the campus, because in May 2008 he was the named contact for and, on information and

belief, an author or approving officer of the institution's public response minimizing those practices to a congressional committee; and, on information and belief, he knew that the institution operated under the public cease and desist order described herein.

145. Defendant Brain substantially assisted the fraud in its concealment phase: by publicly minimizing the institution's practices in May 2008, a public statement that kept the families of former students, including Plaintiff's, deceived as to what had been done to their children and delayed Plaintiff's discovery of her claims; by directing the recruiting and marketing through which families were induced to enroll and to keep paying on the same representations that had been made to Plaintiff's family; and by continuing that recruitment and concealment through the institution's 2014 closure, perpetuating the fraud practiced on Plaintiff's family and the concealment of it.

146. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8), measured from Plaintiff's discovery as alleged supra, and all applicable statutes of limitations are otherwise tolled as set forth supra. Plaintiff is entitled to compensatory and punitive damages from Defendant Brain.

## COUNT XIV: TRAFFICKING WITH RESPECT TO FORCED LABOR (18 U.S.C. §§ 1590 AND 1595)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

147. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

148. Throughout Plaintiff's enrollment, from February 12, 2001 through June 28, 2003, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros knowingly recruited Plaintiff through the referral network described herein, received Plaintiff into

their custody at the FFS campus upon her delivery there by her mother, harbored, maintained, and obtained Plaintiff, a minor in their custody, for labor and services in violation of 18 U.S.C. § 1589, including the livestock, snow, garden, grounds, cinder-block, isolation-watch, dormitory, and retreat-house labor described herein, transported her out of and back into the State of New York for that labor, on the trips to Pennsylvania described herein, pursued and returned her when she fled, and held her at the FFS campus under the regime of confinement, blackout, monitored and censored family contact, and institutional sanction alleged herein, in violation of 18 U.S.C. § 1590.

149. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

## COUNT XV: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

150. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

151. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

152. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by harboring and concealing the surviving records of the enterprise. Upon acquiring the FFS campus in November 2014, Chapel Hill Land Holdings LLC held on that property, in an outbuilding, institutional records of FFS that had survived the destruction described herein, and those records remained concealed there, within its possession and

control as the property's owner, for approximately a decade, never voluntarily disclosed or produced to law enforcement, and were recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial, the prosecution of federal sex offenses committed against FFS students.

153. At no time before that recovery did Chapel Hill Land Holdings LLC disclose the existence of those records to any authority, and at no time before or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has it made any report or any voluntary disclosure concerning the enterprise whose principal asset it received. Each month of that continued concealment and silence constitutes a fresh act of obstruction within the limitations period. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding, harbored and concealed the same records and made the same non-disclosure. On October 2, 2026, after written notice to preserve the outbuilding and its contents and a request to inspect them, Chapel Hill Land Holdings LLC through its attorneys denied awareness of any such structure and refused inspection, as alleged in paragraph 23; that denial, made after notice and after the federal agent's sworn testimony that the records had been recovered from that structure, is a further and continuing act of obstruction by both Defendants named in this Count.

154. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C.

§ 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XVI: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

155. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

156. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

157. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by harboring on its property, in an outbuilding, the surviving institutional records of the enterprise, including, upon information and belief, records of the operation's labor practices, sanctions, finances, and the enrollment of the children whose labor ran it, until their recovery by federal law enforcement pursuant to a search warrant, and by making no voluntary disclosure at any time. Its concealment withheld from enforcement the documentary record of the forced-labor operation alleged herein, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding, harbored and concealed the same records, and the October 2, 2026 denial and refusal of inspection alleged in paragraph 23, made after written notice to preserve, is a further and continuing act of obstruction by both Defendants named in this Count.

158. Each month of that continued concealment and silence, including following the 2024 federal indictment of Paul Geer and his conviction on March 3, 2025, constitutes a fresh act of obstruction

within the limitations period. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XVII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

159. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

161. Throughout the relevant period, including throughout Plaintiff's 2001-2003 enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries from the tuition-funded accounts described herein. At those recurring deliveries Sysco's own drivers observed, and received the benefit of, the labor of the children of the institution, who unloaded Sysco's trucks as part of the uncompensated labor regime alleged herein, delivery after delivery, year after year, without any adult labor crew in their place. On information and belief, Plaintiff was among those children, unloading the food Sysco delivered from its trucks in the

presence of Sysco's delivery personnel and carrying it into the institution's kitchen and storage areas.

162. Sysco's notice was accordingly of a different character from that of any other Defendant: not financial inference but direct physical observation, its own employees on the campus taking the work of children's hands off its own trucks. Its benefit was likewise direct and twofold: years of recurring institutional sales revenue paid from the operation's tuition-funded accounts, and the children's unloading labor itself, received without cost at each delivery.

163. Sysco obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by continuing to supply and service the operation, and to accept payment and the children's labor from it, while making no report and no disclosure to any authority at any time, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025. Its silence protected a revenue stream its own personnel could observe was serviced by children, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

164. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Sysco's silence prolonged the concealment of the operation's forced labor economy, in which its own supply relationship was embedded, and thereby delayed Plaintiff's discovery and assertion of her claims. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against Sysco Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XVIII: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)**

**(Against Jeffrey Brain)**

165. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

166. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

167. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

168. At no time, then or since, including after the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

169. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

## COUNT XIX: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Jeffrey Brain)**

170. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

171. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

172. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse and forced labor in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional labor practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and

deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

173. At no time, then or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

174. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**<u>COUNT XX: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)</u>**

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, Sysco Syracuse, LLC, Chapel Hill Land Holdings LLC, and French Woods Performing Arts Inc.)**

175. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

176. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein: it obtained the labor and services of the children in its custody, including Plaintiff, by force, physical restraint, serious harm, and the abuse of its custodial position, and it recruited, transported, harbored, and obtained those children for that labor. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that

venture, knowing or in reckless disregard of the fact, or in circumstances in which it should have known, that the venture obtained the labor and services of the children in its custody, including Plaintiff, by the unlawful means alleged herein.

177. The benefits received include: as to Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, the children's labor itself, which ran the institution and displaced the wages a lawful residential school must pay, together with the tuition margins undiminished by labor costs; as to Jeffrey Brain, compensation for his role in the operation; as to Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc., real property and successor assets improved, maintained, and built with the unpaid labor of the children, and, as to Eagle Valley, upon information and belief, the care, maintenance, and training of dogs supported by the unpaid labor of FFS students in the canine operation conducted by its own founder and president, and the benefit of the labor of the student body, including Plaintiff, that ran the institution housing that operation; as to the Highlights Defendants, upon information and belief, the portion of the enterprise's tuition-funded money that flowed to them through the integration of their publications into the purported education the venture sold, together with the uncompensated labor of FFS students at their Wayne County retreat; as to The Hancock Herald, revenues derived from its promotional relationship with the operation; as to NATSAP, membership dues paid from the operation's revenues; and as to the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors, upon information and belief, the economic benefit of the operation's continuation within their communities, as alleged in Count I.

178. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## COUNT XXI: KNOWING BENEFICIARIES OF SEX TRAFFICKING (18 U.S.C. §§ 1591(a)(2) AND 1595)

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, and Sysco Syracuse, LLC)**

179. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

180. The operation of FFS was a venture engaged in violations of 18 U.S.C. § 1591, as alleged herein, including the sex trafficking of children in its custody established by the federal criminal conviction of FFS staff member Paul Geer alleged herein; the sexualized intake practices, including the strip search of a fifteen-year-old girl that dislodged a surgically placed item from her body and, on information and belief, the photographing of unclothed children, to which Plaintiff herself was subjected; the sexualized shaming sanctions imposed upon her, including the written account of her sexual history that a fifteen-year-old was made to prepare and read aloud to adults; and the custody of children, including Plaintiff, by an institution that kept Geer in charge of its trips off the campus throughout her enrollment, including the 2001 trip to Toronto for which he was convicted. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact that the venture engaged in the sex trafficking of children in its custody. As to Education Plus Corporation and the Argiros Defendants, that knowledge was actual: the venture's administration had been told, years before Plaintiff's arrival, that Geer had confessed to sexual misconduct with students, had refused to remove him because of the value of his choir to the institution, had reported

nothing to anyone; on information and belief, in or about 2001, a student whom Geer had sexually assaulted on a chorus trip to Toronto reported the assault to Emmanuel Argiros, and no report was made and no action taken; and the venture kept Geer on staff and in custody of children throughout Plaintiff's enrollment.

181. The benefits received by each Defendant named in this Count are those set forth in Count XX, each of which flowed from a venture that was, at the same time and through the same principals, engaged in the sex trafficking of the children whose labor produced them.

182. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## **COUNT XXII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)**

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

183. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

184. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein. NBT Bank, N.A. knowingly benefited, financially and by receiving things of value, from participation in that venture: it maintained the operation's accounts and those of its principals, processed the operation's payroll, held blanket security interests in the operation's assets, including its tuition receivables and enrollment contracts, among them the contract under which Plaintiff was enrolled, extended secured credit to the operation and its property-holding entity, and received fees, interest, and deposit balances swollen by the wages the operation never paid, including in connection with the tuition paid on Plaintiff's behalf. The bank's relationship with the venture was not that of a passive depository: it was the venture's secured lender, it underwrote and,

on information and belief, inspected and appraised the very campus on which the children labored, it held liens on the operation's inventory, accounts, and contract rights from 2002 forward, first taken on December 2, 2002, before Plaintiff's enrollment, and in force throughout it, and renewed and expanded thereafter, and it held, from March 24, 2010, a mortgage on the campus itself; and after the school closed it continued to receive things of value from the venture, holding its lien on the enterprise's collateral by continuation through December 18, 2021, holding its lien on the transferee of the campus from February 27, 2015 through February 27, 2020, and, on information and belief, collecting interest, fees, and the proceeds of the enterprise's assets throughout, benefits received within the years immediately preceding the filing of this action.

185. The bank's collateral was, in substantial part, itself the product of the children's labor. The campus real property securing its March 24, 2010 loan to the title-holding family entity, and the equipment, inventory, livestock, and improvements swept by its blanket security interests, including the first interest, taken on December 2, 2002, in the middle of Plaintiff's enrollment, and renewed on January 30, 2004 and May 30, 2006, after her departure, were built, renovated, maintained, and improved by the unpaid labor of the children in the venture's custody, so that the forced labor alleged herein directly enhanced and preserved the value of the collateral securing the bank's own position, and the bank held, through its liens, a direct financial stake in the product of that labor. Plaintiff's own labor is part of that collateral: the pigs she tended were the livestock the bank's liens expressly covered; the gardens and grounds she kept and the snow she cleared were the upkeep of the very real property against which the bank lent and in which it held its security; and, on information and belief, the food she unloaded from Sysco's trucks was the inventory covered by that lien, stocked into the bank's collateral by a child's hands while the lien was in force. A lawful residential school pays adults to do that work; this venture had children do it, and the bank's

collateral was worth more, and its borrower more creditworthy, for every hour of it. The bank therefore held a direct financial interest in the continuation of the operation and in the continued confinement of the children in it: without enrolled children there was no tuition to repay the bank, and without children to house there was no operating campus to secure it.

186. NBT Bank knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means, for the reasons and on the notice progression set forth in Counts IV and VIII supra, including the public record of the operation's unlicensed operation, the 2008 congressional hearings, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, the secured-lender knowledge arising from its own collateral position in the operation's receivables, inventory, and real property, including, upon information and belief, the repeated inspection and appraisal of the campus incident to its secured lending against it over the life of the relationship, on which the children's labor maintaining that collateral was open and visible, and the financial records that passed through its own ledgers, which showed an operation whose only revenue was tuition and whose expenditures on the children were a fraction of what any lawful residential facility spends, and which, on information and belief, included, year after year through 2014, the payroll of a staff member whose confessed sexual misconduct with students the administration had chosen to keep on staff; and, in the alternative, if the bank did not conduct the inspections, appraisals, and financial reviews its own standards required, its departure from those standards was a deliberate avoidance of the knowledge they would have supplied. NBT Bancorp Inc. is liable as alleged herein. Among the things of value NBT Bank received from the venture were the deposit,

lending, fee, and payoff revenue described herein and, on information and belief, the standing and business it drew from being held out as the community's bank through organizations the School's president ran. NBT Bank was not a passive depository of the venture's funds: it was the venture's secured lender, its mortgagee, and the holder and processor of its payroll, in a continuous relationship that ran from before the first lien through the conveyance it financed and the transferee it took, and its participation in the venture was, for those reasons, beyond that of a provider of routine financial services.

187. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

188. Defendant NBT Bancorp is liable under this Count for its own conduct and as principal for the conduct of NBT Bank undertaken as its agent. Its own conduct consists of the policies it set and oversaw, the credit extended and secured under those policies, the benefits it knowingly received and reported as its own, and the knowledge of the executives through whom it acted.

## COUNT XXIII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

189. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

190. The operation of FFS was a single, continuous venture from its founding through its 2014 closure, engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein, by the same methods and on the same campus throughout, including during Plaintiff's enrollment. Sysco knowingly benefited, financially and by receiving things of value, from participation in that

venture. Throughout the relevant period, including throughout Plaintiff's enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries, delivery after delivery, year after year, from the tuition-funded accounts described herein, tuition the operation retained as margin because it paid no wages for the labor the children performed. Sysco's participation was not that of an arm's-length vendor. At each recurring delivery it received the children's labor itself, without cost, in the unloading of its own trucks by the children of the institution, without any adult labor crew in their place. On information and belief, Plaintiff was among those children, unloading the food Sysco delivered from its trucks in the presence of Sysco's delivery personnel and carrying it into the institution's kitchen and storage areas. The benefits Sysco received were thus twofold and direct: years of recurring institutional sales revenue paid from the proceeds of the venture, and the children's unloading labor, including Plaintiff's, received at the truck at every delivery.

191. Sysco knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means. Its knowledge was of a different character from that of any other Defendant: not financial inference but direct physical observation. Sysco's own delivery personnel were on the campus at every delivery, taking the work of children's hands off Sysco's own trucks, and Sysco's own delivery volume showed that it was provisioning an institutional kitchen for hundreds of residents that, on its employees' own observation, was stocked and staffed by the children it was feeding. That knowledge, acquired by Sysco's employees in the course of their duties, is the knowledge of Sysco. Sysco made no inquiry, no report, and no disclosure to any

authority at any time, and continued to supply the operation, to accept payment from it, and to accept the children's unloading labor throughout.

192. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from Sysco Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XXIV: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

193. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

194. Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc. knowingly benefited, financially and by receiving things of value, from participation in the venture alleged herein, which obtained the labor and services of the children in its custody, including Plaintiff, by the means prohibited by 18 U.S.C. §§ 1589 and 1590. The thing of value they received was the venture's principal asset: the campus at 431 Chapel Hill Road and every dormitory, dining facility, chapel, field, and improvement on it, built, repaired, cleaned, and maintained over decades by the uncompensated labor of FFS students, including the gardens and grounds Plaintiff herself kept, the paths she cleared of snow, and the livestock she tended on them between 2001 and 2003. Chapel Hill Land Holdings LLC received that asset in November 2014 for less than its assessed value, from an insider, on the venture's own lender's financing, with the venture's records in an outbuilding on the premises; French Woods Performing Arts Inc. took possession of it and has operated it as a residential camp every season since, housing, feeding, and charging campers for the structures the children built, at a charge, on information and belief, of up to approximately $16,000

per camper per summer. Each season's revenue is a benefit received from the fruits of the children's labor, and each is a benefit received within the years immediately preceding the filing of this action. Their participation in that venture was not that of an arm's-length purchaser. The venture's conduct did not end with the School's closure: its conveyance of the campus, its concealment of the records kept on that campus, and its retention of the proceeds continued through 2014 and after, and these Defendants participated in those acts, taking the venture's principal asset from the venture's own insider entity in its wind-down, at less than its assessed value, on the venture's own lender's financing, with the venture's records on the premises, through a principal who sits, beside the venture's own lender's branch manager, on the board of the corporation the venture's president presides over, and continuing the venture's use of the campus and its structures as a residential facility for children every season since, charging, on information and belief, up to approximately $16,000 per camper per summer for the dormitories, dining facilities, chapel, and grounds the children built and maintained without pay. A venture that has engaged in forced labor does not cease to be one because its campus passed to a participant with notice who continues to profit from the fruits of that labor every season, and these Defendants knew or should have known that the venture had engaged in the violations alleged herein.

195. These Defendants knew, or in the circumstances alleged herein should have known, that the venture from which they benefited had obtained that labor by unlawful means: their principal was a neighbor and friend of the Argiros family for many years and sat with the School's president on the board of Hancock Partners, Inc.; the School had been publicly accused, publicly investigated by four State agencies, and publicly closed before the conveyance; the structures they took were visibly the work of children, built on a campus whose published program was that its students built and maintained it; the School's records sat in an outbuilding under their control for a decade; and,

after the 2024 federal indictment, the 2025 public trial at which the School's president admitted the destruction of records, the March 3, 2025 conviction, and written notice in September 2026 to preserve the outbuilding and its contents, they denied its existence and refused inspection. They have never disclosed what they received or what they held, and they continue to receive the benefit today.

196. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally, together with disgorgement of the benefits they received from the venture. All applicable limitations periods are tolled as set forth supra.

**COUNT XXV: CIVIL REMEDY FOR PERSONAL INJURIES (18 U.S.C. § 2255)**

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

197. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

198. Plaintiff, while a minor, was a victim of violations of 18 U.S.C. § 2423(a). During her enrollment, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros knowingly transported Plaintiff, then a minor in their custody, in interstate commerce from the FFS campus in New York to Pennsylvania and back, in the custody of FFS staff, on the trips to the religious retreat house described herein, where she was put to construction and landscaping labor, and, on information and belief, to the Highlights Defendants' Wayne County retreat. Among the purposes of that transport, which need not have been its sole purpose, was that Plaintiff be returned to and continue to be subjected to the regime described herein, including the strip search and, on information and belief, the photographing that Defendants' uniform intake and re-entry policy required of children entering the institution's custody, conduct constituting sexual activity

for which a person can be charged with a criminal offense under New York law, including the use of a child in a sexual performance; and the trips were conducted by an institution that, with knowledge of the confessed sexual misconduct with students of the staff member it kept in charge of its trips, Paul Geer, and in the same course of conduct as the trips for which he was convicted of transporting FFS students for the purpose of criminal sexual activity, including the 2001 trip to Toronto conducted during Plaintiff's own enrollment, continued to take minor children out of the State in the custody of unlicensed staff. Defendants acted in concert with one another within the meaning of 18 U.S.C. § 2423(e). Plaintiff, while a minor, was additionally a victim of violations of 18 U.S.C. §§ 2251 and 2252. During Plaintiff's February 2001 intake, as described herein, Defendant Education Plus Corporation, acting through the staff who carried out the uniform intake policy that it and Defendants Betty Argiros, Emmanuel Argiros, and Cindy Argiros adopted, directed, and enforced, on information and belief used and employed Plaintiff, then a fifteen-year-old minor, in the production of a visual depiction of Plaintiff taken in the course of the intake strip search described herein, in violation of 18 U.S.C. § 2251, using photographic film, cameras, and materials that had been mailed, shipped, and transported in interstate and foreign commerce; and, on information and belief, that photograph was placed directly into a book maintained by the institution and knowingly retained and possessed by Defendant Education Plus Corporation through at least FFS's 2014 closure, in violation of 18 U.S.C. § 2252.

199. As a direct and proximate result of those violations, Plaintiff suffered personal injuries as alleged herein, including the injuries arising from the strip search, the photography, and the institution's retention of that image of her. Pursuant to 18 U.S.C. § 2255, Plaintiff is entitled to recover her actual damages, and in any event liquidated damages in the amount provided by 18 U.S.C. § 2255 of no less than $150,000, together with the cost of the action and reasonable

attorneys' fees. This Count is subject to no limitations period, and all applicable limitations periods are in any event tolled as set forth supra.

## COUNT XXVI: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983: FOURTEENTH AMENDMENT: STATE-CREATED DANGER AND DELIBERATE INDIFFERENCE TO KNOWN ABUSE

**(Against the Village of Hancock, New York, individually and through the Village of Hancock Police Department; the Town of Hancock, New York; the County of Delaware, New York; the Delaware County Sheriff's Office; and the Delaware County Board of Supervisors)**

200. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

201. At all relevant times, the Village of Hancock, acting through Hancock PD, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors acted under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiff possessed a constitutionally protected liberty interest in personal security and bodily integrity under the Fourteenth Amendment.

202. Throughout Plaintiff's enrollment, on information and belief, Hancock PD maintained a standing practice and custom of locating children who ran away from FFS and returning them to the institution's custody without inquiry into why they had fled, and FFS students, including Plaintiff, understood that flight was futile because the institution's staff, its dogs, and the local police would return them. By affirmatively returning runaway children to a private actor whose unlicensed operation was a matter of official record, without inquiry, Hancock PD created and enhanced the danger to every child confined at FFS, including Plaintiff, foreclosed the one avenue of escape and report a confined child had, and rendered Plaintiff more vulnerable than she would

otherwise have been, in violation of her substantive due process rights. On information and belief, the institution supplied its intake photographs of its students, including Plaintiff, to Hancock PD for that purpose. Plaintiff, delivered into the institution's custody at fifteen and held there under the regime described herein, fled twice: once she surrendered herself at a police station in Binghamton and was returned to the institution, and once she reached the town of Hancock, where an FFS employee located her and returned her, and on neither occasion did any officer or official inquire why a child had fled. She understood thereafter, as the institution intended, that flight was futile and that the local police would return her to the institution, and she left only when, at eighteen, she was graduated. The practice was carried out pursuant to the standing custom of Hancock PD, for which the Village is liable.

203. Upon information and belief, and consistent with the pattern of deliberate indifference alleged as to other FFS students across multiple years, Hancock PD and the Delaware County Sheriff's Office were aware of the 1990 cease and desist order, the official notice record described herein, including the December 2010 joint findings of four New York State agencies, and the pattern of abuse those records evidenced, and nonetheless permitted FFS to continue operating without effective oversight throughout Plaintiff's 2001-2003 enrollment, including by returning children who fled the campus to the custody of the enterprise. The Town of Hancock, within whose borders the FFS campus operated and whose officials possessed the same notice record, likewise permitted FFS to operate without effective oversight, and that failure constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the Town is liable. The Delaware County Board of Supervisors' failure to exercise oversight authority over the Sheriff's Office notwithstanding that knowledge constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the County is liable.

204. As a direct and proximate result of Defendants' conduct and deliberate indifference, Plaintiff continued to suffer conditions that would have been halted had Defendants fulfilled their constitutional obligations, including the forced labor, hunger, and confinement described herein. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988. All applicable statutes of limitations are tolled as set forth supra.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lauren Blythe respectfully demands judgment against Defendants, jointly and severally, as follows:

(A) Compensatory damages in an amount to be determined at trial, but in no event less than $2,000,000, including the cost of past and future medical, psychiatric, therapeutic, and addiction-treatment care, lost earnings and earning capacity, the value of the uncompensated labor extracted from Plaintiff, and restitution of all tuition and charges paid;

(B) Treble damages pursuant to 18 U.S.C. § 1964(c) on Plaintiff's RICO claims, in no event less than $5,000,000;

(C) Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

(D) Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 1595, N.Y. Social Services Law § 483-bb(c), 18 U.S.C. § 2255, 42 U.S.C. § 1988, and all other applicable statutes;

(E) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F) Declaratory and injunctive relief as appropriate; and

(G) Any and all other relief this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York
October 14, 2026

Respectfully submitted,

JOHANNESEN & UMANA, P.C.

*Attorneys for Plaintiff*

By: ______________________________

Elizabeth Sarah Johannesen, Esq.

*Founding Partner*

68 Jay Street, Suite 225

Brooklyn, New York 11201

P: (631) 559-1018

elizabethsarahjohannesen@esjlaw.info

**VERIFICATION**

STATE OF NORTH CAROLINA )
) ss.:
COUNTY OF CHATHAM )

I, Lauren Blythe, am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The contents are true to my own knowledge, except as to matters alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on: 10/14/26

Lauren Blythe

Lauren Blythe